AMERADA HESS CORPORATION, ATLANTIC RICHFIELD COMPANY, CONOCO INC., CITIES SERVICE COMPANY, EXXON CORPORATION, PHILLIPS PETROLEUM COMPANY, CHEVRON U.S.A. INC., MOBIL OIL CORPORATION, UNION OIL COMPANY OF CALIFORNIA, GULF OIL CORPORATION, SHELL OIL COMPANY, DIAMOND SHAMROCK CORPORATION, TENNECO OIL COMPANY, AND TEXACO, INC., PLAINTIFFS-RESPONDENTS, v. DIRECTOR, DIVISION OF TAXATION, DEFENDANT-APPELLANT.

Argued November 18, 1986—Decided June 22, 1987.

310

*Mary R. Hamill,* Deputy Attorney General, argued the cause for appellant (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Charles M. Costenbader* argued the cause for respondents Atlantic Richfield Company, Conoco Inc., Cities Service Company, Exxon Corporation, Phillips Petroleum Company, Chevron USA Inc., Mobil Oil Corporation, Union Oil Company of California, Gulf Oil Corporation, Shell Oil Company and Diamond Shamrock Corporation (*Stryker, Tams & Dill,* attorneys; *Charles H. Friedrich,* on the brief).

*Ralph A. Muoio,* a member of the District of Columbia bar, argued the cause for respondent Amerada Hess Corporation (*Wilentz, Goldman & Spitzer,* attorneys).

*Laurence Reich* argued the cause for respondents Texaco, Inc. and Tenneco Oil Company (*Carpenter, Bennett & Morrissey,* attorneys).

The opinion of the court was delivered by

KING, P.J.A.D. (temporarily assigned).

This case concerns the interpretation of seven words in the New Jersey Corporation Business Tax (C.B.T.), *N.J.S.A.* 54:10A–1 to –40. These seven words, "on or measured by profits or income," determine whether the Federal Windfall Profit Tax on Domestic Crude Oil (W.P.T.), 26 *U.S.C.A.* § 4986 to § 4998, is excludable in computing the oil company plaintiffs' net income taxable under our C.B.T.

Entire net income is the base on which New Jersey's C.B.T. is assessed. The entire net income base for the C.B.T. is similar but not identical to the tax base used for federal corporate income tax purposes. Adjusted gross income for federal tax purposes is calculated by deducting certain federal and State taxes

paid by the corporation. New Jersey law specifically requires that certain amounts paid in federal taxes be added back into the tax base for calculation of the C.B.T. This is called the "add-back" provision. Thus, the base for federal corporate income tax is not identical to the "net income" base on which the C.B.T. is assessed. This difference is at the core of the dispute before us.

The fourteen plaintiffs in this case are vertically integrated oil companies that engage in every aspect of the crude oil business, including exploration, development, refining, manufacturing and marketing. None of the plaintiffs has oil producing properties in New Jersey, but all conduct other aspects of their business within this State. In this case the oil companies urge that they can exclude the amount they paid in the Federal Windfall Profits Tax on Domestic Crude Oil (W.P.T.), I.R.C. §§ 4986 to 4998, from the calculation of their net taxable income for purposes of the New Jersey's Corporation Business Tax (C.B.T.), *N.J.S.A.* 54:10A–1 to –40. The Director of the Division of Taxation disagrees and argues that these payments are not excludable.

The C.B.T. is a fairly allocated franchise or excise tax levied on business corporations for the privilege of "doing business, employing or owning capital or property, or maintaining an office" in New Jersey. *N.J.S.A.* 54:10A–2, 10A–8. The tax basis for the C.B.T. is "entire net income" which is defined in *N.J.S.A.* 54:10A–4(k) as

total net income from all sources, whether within or without the United States, and shall include the gain derived from the employment of capital or labor, or from both combined, as well as profit gained through a sale or conversion of capital assets. For the purpose of this act, the amount of a taxpayer's entire net income shall be deemed *prima facie* to be equal in amount to the taxable income, before net operating loss deduction and special deductions, which the taxpayer is required to report to the United States Treasury Department for the purpose of computing its federal income tax.

However, subsection (k) also provides that

(2) Entire net income shall be determined without the exclusion, deduction or credit of:

\*      \*      \*      \*      \*      \*      \*      \*

(C) Taxes paid or accrued to the United States *on or measured by profits or income* * * *.

[*N.J.S.A.* 54:10A–4(k)(2)(C) (emphasis supplied).]

The crucial issue in this case is whether the W.P.T. is a tax "on or measured by profits or income" within the intent of *N.J.S.A.* 54:10A–4(k)(2)(C). If the W.P.T. is a tax "on or measured by profits or income" within the intent of the C.B.T., the Director was correct in disallowing its exclusion from the net income base for C.B.T. purposes. At the time the net income provision was added to the corporation business tax in 1958, *L.* 1958, *c.* 63, the W.P.T. did not exist. *F.W. Woolworth Co. v. Director, Div. of Taxation*, 45 *N.J.* 466, 473 (1965). Therefore the drafters and adopters of this section of the C.B.T. could not have harbored any specific legislative intent on includability of the W.P.T., which became effective in 1980, in the tax base.

The federal "windfall profits tax on domestic crude oil," I.R.C. §§ 4986–4998 (1980), was imposed after President Carter announced that he would gradually decontrol domestic crude oil prices beginning in June 1979. The price controls originated with President Nixon's Wage and Price Controls in August 1971. The Energy Policy Act made them mandatory through May 1977 and gave the President discretion to remove them until 1981. *See* H.R.Rep. No. 304 96th Cong. 1st Sess. 1980 U.S.Code Cong. & Ad.News 1980, 410, 591. 42 *U.S.C.A.* § 6201, and scattered sections to § 6392. Because of the shortage of crude oil for American markets caused by supply cut-backs by Iran and other foreign producers, President Carter decided to exercise his authority and decontrol prices during 1979. The background of the W.P.T. was described by Justice Powell in *United States v. Ptasynski*, 462 *U.S.* 74, 76–77, 103 *S.Ct.* 2239, 2240, 2241, 76 *L.Ed.*2d 427 (1983).

In 1979, President Carter announced a program to remove price controls from domestic oil by September 30, 1981. [See H.R.Rep. No. 96–304, 5 (1979) reprinted in 1980 U.S.Cong. & Ad.News 593]. By eliminating price controls, the President sought to encourage exploration for new oil and to increase production of old oil from marginal economic operations. See H.R.Doc. No. 96–107, 2 (1979). He recognized, however, that deregulating oil prices would produce substantial gains (referred to as "windfalls) for some producers. The price of

oil on the world market had risen markedly, and it was anticipated that deregulating the price of oil already in production would allow domestic producers to receive prices far in excess of their initial estimates. See *ibid.* Accordingly, the President proposed that Congress place an excise tax on the additional revenue resulting from decontrol.

Congress responded by enacting the Crude Oil Windfall Profit Tax Act of 1980, 94 Stat. 229, 26 *U.S.C.* § 4986 *et seq.* (1976 ed., Supp V) [I.R.C. §§ 4986 to 4998]. The Act divides domestic crude oil into three tiers and establishes an adjusted base price and tax rate for each tier. See §§ 1986, 1989, and 4991. The base prices generally reflect the selling price of particular categories of oil under price controls, and the tax rates vary according to the vintages and types of oil included within each tier. See Joint Committee on Taxation, General Explanation of the Crude Oil Windfall Profit Tax Act of 1980, 96th Cong., 26–36 (Comm.Print 1981). The House Report explained that the Act is "designed to impose relatively high tax rates where production cannot be expected to respond very much to further increases in price and relatively low tax rates on oil whose production is likely to be responsive to price." H.R.Rep. No. 96–304, at 7 [reprinted in 1980 U.S.Cong. & Ad.News 594]; see S.Rep. No. 96–394, p. 6 (1979) [reprinted in 1980 U.S.Cong. & Ad.News 417]

Thus, the windfall tax was imposed on the incremental income attributable to decontrol of domestic oil prices. This incremental income was created by the cartel-generated international oil shortages, which had driven up foreign oil prices. It was attributable to world market conditions designed to limit supply and to raise prices; it was not generated by any infusions of capital or the expenditure of creative entrepreneurial energy by the domestic oil producers. Thus, there emerged the concept of taxing "windfall profits," or profits not earned by traditional economic activity as known to our economy. In mid–1979 just before the beginning of President Carter's decontrol of oil prices, the controlled price of "old" oil was $5.86 a barrel, the controlled price of "new" oil was $13.06 a barrel, and the uncontrolled world price was approaching $20 per barrel. The world price eventually reached $30 per barrel.

The W.P.T. differed from the regular federal corporate income tax as it was imposed on production at the wellhead rather than on these integrated domestic producers' overall net profits or income ultimately calculated from gross sales and net profits as measured at the pump. This method of taxation creates the dispute at hand—whether the W.P.T. is "on or

measured by profits or income" or is another species of tax. As noted, the basic measure of the windfall profit was the difference between the uncontrolled and controlled price of a barrel of crude oil at the point the oil was removed from the producing property. The actual tax rate varied from 30% to 70%, I.R.C. § 4987, and was determined by the length of time the property had been productive. Because oil from newly-productive property was taxed at a lower rate than oil from older wells, tax differentials motivated exploration for and discovery of new oil-producing properties by the domestic companies, thus reducing dependency on foreign oil.

A net income limitation (N.I.L.) also was enacted by Congress to insure that the W.P.T. would not be imposed on a company when the costs of production exceeded the income from a particular property. I.R.C. § 4988. The N.I.L. placed a ceiling on the taxable windfall profit equal to 90% of the net income from a barrel of oil, netting barrels sold at a profit with barrels selling at a loss. I.R.C. § 4988(b). The W.P.T. was imposed on the lesser of the windfall profit or 90% of the net income per barrel. All fourteen respondent oil companies used the N.I.L. to calculate their W.P.T. liability for the taxable years under scrutiny, 1980 and 1981. The use of the N.I.L. resulted in a total savings of $1,685,465,293 to these taxpayers over the tax that would have applied if the wellhead assessment had stood alone without the N.I.L. The W.P.T. is a deduction for federal income tax purposes. I.R.C. §§ 164(a)(4), 4988(b). The W.P.T. remains effective until December 1990 or until $227.3 billion is realized, whichever is later. I.R.C. § 4990.

In the spring of 1983 the fourteen respondent oil companies filed complaints in the New Jersey Tax Court challenging either assessments for deficiencies or denial of refund claims in respect of all of their 1980, and in five instances their 1981, C.B.T. returns. The Director of the Division of Taxation in each case had denied deduction of the W.P.T. from the C.B.T. "net income" base. For each denial, the Director had relied on the position of the New York State Department of Taxation and

Finance, which ruled in May 1982 that the W.P.T. was a measure of profits and not excludable for purposes of determining income under the New York Corporate Franchise Tax, which is similar to the C.B.T. *TSI–M* 82 (227) *CCH State Tax Rptr.* (N.Y.) ¶ 9–909. The New York administrative ruling, set out in the margin in full, concluded: "As the windfall profit tax is measured by profit the modification is required and the tax must be added to entire net income." [1]

---

[1]Memorandum *TSB–M*–82(22)C.

Technical Services Bureau, Taxpayer Services Division, Department of Taxation and Finance, Corporation Tax, July 12, 1982.

Opinion of Counsel

Deductibility of Federal Windfall Profits Tax under Article 9–A

May 28, 1982

William A. Craven, Director

Audit Division

Your memorandum of November 14, 1980 to Saul Heckelman requested an opinion as to whether the windfall profit tax imposed by Chapter 45 of the Internal Revenue Code of 1954, as amended, is a modification increasing the entire net income base for the Article 9–A franchise tax of subject taxpayers.

Section 208.9 of the Tax Law provides in pertinent part that:

"(b) Entire net income shall be determined without the exclusion, deduction or credit of:

(1) the amount of any specific exemption or credit allowed in any law of the United States imposing any tax on or measured by the income of corporations,

\* \* \* \* \* \* \* \*

(3) taxes on or measured by profits or income paid or accrued to the United States, ..."

Section 4986(a) of the Internal Revenue Code provides that:[2]

"An excise tax is hereby imposed on the windfall profit from taxable crude oil removed from the premises during each taxable period."

The tax is also characterized in the conference report as a severance tax. Section 4987(a) thereof states that the tax is an applicable percentage of windfall profit; windfall profit is defined in section 4988(a) thereof as follows:

"General Rule. For purposes of this chapter, the term 'windfall profit' means the excess of the removal price of the barrel of crude oil over the sum of—

(1) the adjusted base price of such barrel, and

(2) the amount of the severance tax adjustment with respect to such barrel provided by section 4996(c)."

Section 4988 thereof places a net income limitation on windfall profit.

The oil companies and the Director filed cross-motions for summary judgment in the Tax Court. Judge Conley granted summary judgments for the Director. *Amerada Hess v. Director, Div. of Taxation*, 7 *N.J.Tax* 51 (1984) (*Amerada I*). He concluded that our "legislature surely perceived the windfall profits tax to be a tax on profits or income and felt no need to amend the corporation business tax for that reason." *Id.* at 56. In holding that the sum of the W.P.T. must be included in the "net income" base, Judge Conley accepted the Director's contention that the Legislature did not have to amend the C.B.T. after the W.P.T. was enacted because the W.P.T. already fell within the "add-back" provision of *N.J.S.A.* 54:10A–4(k)(2)(C). He rejected the oil companies' contention that because the Legislature did not amend the C.B.T., the W.P.T. did not fall within the "add-back" provisions and that excludability was intended.

The oil companies moved for reconsideration of Judge Conley's decision. Judge Lario, who was assigned to hear these motions because Judge Conley had resigned from the bench to return to private practice, refused to "substitute ... [his] interpretation of the Legislature's intent," for that of Judge Conley. *Amerada Hess Corp. v. Director, Div. of Taxation*, 7 *N.J.Tax* 275, 282 (1985) (*Amerada II*).

---

Section 164(a)(5) of the Internal Revenue Code, as amended by Public Law 96–223, allows a deduction from federal adjusted gross income for the amount of windfall profit tax; other deductible taxes allowed under section 164 include those levied on real property, personal property, foreign, state and local income taxes, and general sales taxes.

The modification required by section 208.9(b)(3) of the Tax Law is not dependent on whether the federal tax is an excise tax or property tax or income tax in nature. The modification is required where the tax is levied on or measured by profit or income. As the windfall profit tax is measured by profit, the modification is required and the tax must be added to entire net income.

PAUL B. COBURN
Deputy Commissioner and Counsel

The Appellate Division reversed the Tax Court and held that the W.P.T. was "a federal excise tax imposed upon the difference between world prices and the adjusted base price." *Amerada Hess Corp. v. Director, Div. of Taxation*, 208 *N.J.Super.* 201, 203 (1986) (*Amerada III*), and that in calculating the net income base for the purposes of C.B.T., the oil companies could exclude the W.P.T.. The Appellate Division reasoned that since the W.P.T. was imposed as each barrel of crude oil is brought to the surface, "its consequences are in no way dependent upon the realization of gain or income, and no provision is made for a refund or credit should the barrel not be sold," *id.* at 203–04, and held that "the W.P.T. is not a tax on or measured by profits or income within the meaning of *N.J.S.A.* 54:10A–4(k)(2)(C)." The Appellate Division did not think that the 90% N.I.L. materially influenced the analysis because the N.I.L. was calculated on "properties" of the oil producer and not on "overall profitability." *Ibid.*

For the reasons given below, we reverse the judgment of the Appellate Division and reinstate the judgment of the Tax Court.

## I

■■ We conclude that the Tax Court properly applied the principle of probable legislative intent in deciding that the phrase in *N.J.S.A.* 54:10–4(k)(2)(C), "taxes paid or accrued to the United States on or measured by profits or income," included the W.P.T. The principle of probable intent applies where the legislative body, when adopting a statute, could not have contemplated a specific situation. In such a case we have said:

Generally, a court's duty in construing a statute is to determine the intent of the Legislature. In cases such as this, where it is clear that the drafters of a statute did not consider or even contemplate a specific situation, this Court had adopted as an established rule of statutory construction the policy of interpreting the statute "consonant with the probable intent of the draftsman 'had he anticipated the situation at hand'." *J.C. Chap. Prop. Owner's etc. Assoc. v. City Council*, 55 *N.J.* 86, 101 (1969) (quoting *Dvorkin v. Dover Tp.*, 29 *N.J.* 303, 315 (1959)); *Safeway Trails, Inc. v. Furman*, 41 *N.J.* 467 appeal dismissed and *cert.* den., 379 *U.S.* 14, 85 *S.Ct.* 144, 13 *L.Ed.*2d 84 (1964). Such an interpretation will not "turn on literalisms, technisms or the so-called rules of interpreta-

tion; [rather] it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation." *J.C. Chap. Prop. Owner's*, 55 *N.J.* at 100. [*AMN, Inc. v. South Brunswick Township Rent Leveling Bd.*, 93 *N.J.* 518, 525 (1983).]

One commentator has noted, "Legislative purpose may also be a valuable guide to decision in cases where the effect of a statute on the situation at hand is unclear … because the situation was unforeseen at the time when the act was passed, …" 2A C. Sands, *Sutherland Statutory Construction*, § 45.09 (4th ed. 1984) (hereinafter *Sutherland*). The "common sense" of this situation, as we perceive it, and as the Tax Court pointed out, *Amerada I*, 7 *N.J.Tax* at 56, is that if the Legislature had anticipated the enactment of the W.P.T., it would have been concerned over the possible effect of a new federal tax on profits on the State's revenues. The deductibility of the W.P.T. would shrink the State's tax base by the amount of the taxes paid. We think the Legislature probably would have viewed the W.P.T. as a tax on the "profits" and "income" of oil companies, thereby avoiding a revenue loss. Thus, no amendment to the C.B.T. would have been necessary to embrace the W.P.T. within the inclusive basis of *N.J.S.A.* 54:10A–4(k)(2)(C).

■ We reject the oil companies' contention that the doctrine of legislative intent has no application because the meaning of the statute is unclear and all doubts should be resolved in favor of the taxpayer. *See Fedders Fin. Corp. v. Director, Div. of Taxation*, 96 *N.J.* 376, 386 (1984); *see also White v. United States*, 305 *U.S.* 281, 292, 59 *S.Ct.* 179, 184, 83 *L.Ed.* 172 (1938), where Justice Stone said

We are not impressed by the argument that, as the question here decided is doubtful, all doubts should be resolved in favor of the taxpayer. It is the function and duty of the courts to resolve doubts. We know of no reason why that function should be abdicated in a tax case more than in any other where the rights of suiters turn on the construction of a statute and it is our duty to decide what that construction fairly should be.

Here we do not think the statute is unclear or of doubtful meaning. Moreover, where the taxpayer seeks exemption or deduction urging exclusion from the scope of the taxing stat-

ute, "the probable legislative intent is one of inclusion and exemptions are to be construed narrowly." *Fedders,* 96 *N.J.* at 386; *Boys' Club of Clifton, Inc. v. Township of Jefferson,* 72 *N.J.* 389, 398 (1977). The reason for this rule of construction is plain. Taxes "are demanded and received in order for government to function." *Bloomfield v. Academy of Medicine of N.J.,* 47 *N.J.* 358, 363 (1966). Exemptions "from taxation represent a departure and consequently they are most strongly construed against those claiming exemption." *Id.* As the Tax Court pointed out, "the issue here is whether the "plaintiffs may exclude or deduct the W.P.T." *Amerada I,* 7 *N.J.Tax* at 53. The Director's ruling that the taxpayers here did not meet that burden was reasonable in the circumstance.

We also reject the oil companies' contention that the issue involves solely the "add-back" of the W.P.T. to income or the inclusion of the W.P.T. in income. The scheme of the C.B.T. supports the Tax Court's characterization of the issue as one involving an exclusion or deduction. "Entire net income" for purposes of the preliminary computation of the C.B.T.'s income base is "federal taxable income" before the net operating loss deduction and special deductions, *e.g.,* the dividends received by corporations' deduction under *I.R.C.* § 243. *N.J.S.A.* 54:10A–4(k). As shown by some of the plaintiffs' 1980 and 1981 federal income tax returns, the W.P.T. was claimed as a deduction on line 17 in arriving at federal taxable income. But *N.J.S.A.* 54:10A–4(k)(2) provides that certain exclusions, deductions and credits are not allowed to the taxpayer in calculating entire net income under *N.J.S.A.* 54:10A–4(k)(2)(C). As noted, one disallowed deduction is for "taxes paid or accrued to the United States on or measured by profits from income." Thus the correct characterization of the issue is whether the W.P.T. is a proper exclusion or deduction.

The oil companies' reliance on *Fedders* is unsuccessful for another reason. In *Fedders,* Justice Schreiber noted that in addition to the rule concerning the strict construction of taxing statutes "when interpretation of a taxing statute is in doubt,"

96 *N.J.* at 385, there is a second principle: a court must "follow the clear import of statutory language." *Id.* at 384–85. The Tax Court correctly concluded that the "clear import" of the W.P.T. fit the language of the taxing statute—"taxes on or measured by profits or income"—as these words are commonly understood.

Another fundamental principle of statutory construction applies here. Statutes must be read as a whole, giving effect where possible to every word. *Brown v. Brown*, 86 *N.J.* 565, 577 (1981); *Fabbi v. Division of Employment Sec.*, 35 *N.J.* 601, 606 (1961). When *N.J.S.A.* 54:10A–4(k), including subsection (k)(2)(C), is read in its entirety, we see that when the Legislature wanted to define the word "income" in terms of the federal income tax law, it did so in clear terms. The statute states that "entire net income" prior to the modifications in subsection (2)(A) through (2)(F) "shall be deemed ... to be ... the taxable income ... which the taxpayer is required to report to the United States Treasury Department for the purpose of computing its federal income tax." The language of subsection (k)(2)(C) is completely different. The disallowed federal taxes are not described as income taxes, or net income taxes, or taxes based on income as measured for federal income tax purposes, but simply as federal taxes "on or measured by profits or income," a more inclusive concept. Nowhere in the C.B.T. do we find any intent to disallow only federal taxes similar or identical to the federal income tax.

The distinction between the preliminary computation of entire net income under the C.B.T. (which is clearly referenced to the federal income tax) and the modifications to that preliminary computation, which differs from the federal income tax, was explained by that Tax Court in *International Flavors and Fragrances, Inc. v. Director Div. of Taxation*, 5 *N.J.Tax* 617 (1983), aff'd, 7 *N.J.Tax* 652 (App.Div.1984), aff'd, 102 *N.J.* 210 (1986), when it said

> While the starting point for determination of entire net income under the act is taxable income, before net operating loss deduction and special deductions,

which the taxpayer is required to report for Federal income tax purposes, the Corporation Business Tax deviates from the federal tax by providing its own inclusions and exclusions from the tax base. *N.J.S.A.* 54:10A–4(k). Only at the initial point is it indicated that the Legislature intended that federal standards were to be controlling. [5 *N.J.Tax* at 624.]

The Tax Court in the case before us agreed with this conclusion. *Amerada I*, 7 *N.J.Tax* at 57.

Finally on this point, we reject the oil companies' contention that legislative inaction or silence in respect of the enactment of the W.P.T. supports its contention of non-inclusion. We find the doctrine of probable legislative intent a more reliable guide than the so-called doctrine of legislative inaction. "Legislative inaction has been called a 'weak reed upon which to lean' and a 'poor beacon to follow' in construing a statute." 2A *Sutherland* § 49.10. We see no common-sense reason why our Legislature would not have intended the W.P.T. to be included within the statutory disallowance for tax "on or measured by profits or income." We adopt Judge Conley's words in the Tax Court in this case when he said: "I am entirely satisfied from the ordinary meaning of these words and from the public perception of the purpose of the Windfall Profit Tax, that the legislators would have been reassured that no amendment of the statutory language was needed to protect the State's revenue source." 7 *N.J.Tax* at 56.

■ We find Justice Scalia's discussion of the use of legislative inaction as a tool of interpretation in *Johnson v. Transportation Agency, Santa Clara County*, 480 *U.S.* ——, 107 *S.Ct.* 1442, 94 *L.Ed.*2d 615 (1987) (dissenting opinion) of interest and apt.

The majority's response to this criticism of [*Steelworkers v. Weber*, 443 *U.S.* 193, 99 *S.Ct.* 2721, 61 *L.Ed.*2d 480 (1979) ], ... asserts that, since "Congress has not amended the statute to reject our construction, ... we ... may assume that our interpretation was correct." This assumption, which frequently haunts our opinions, should be put to rest. It is based, to begin with, on the patently false premise that the correctness of statutory construction is to be measured by what the current Congress desires, rather than by what the law as enacted meant. To make matters worse, it assays the current Congress' desires *with respect to the particular provision in isolation*, rather than (the way the

provision was originally enacted) as part of total legislative package containing many *quids pro quo.*

\* \* \* \* \* \* \* \*

But even accepting the flawed premise that the intent of the current Congress, with respect to the provision in isolation, is determinative, one must ignore rudimentary principles of political science to draw any conclusions regarding that intent from the *failure* to enact legislation. The "complicated check on legislation," The Federalist No. 62, p. 378 (C. Rossiter ed. 1961), erected by our Constitution creates an inertia that makes it impossible to assert with any degree of assurance that congressional failure to act represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice. It is interesting to speculate on how the principle that congressional inaction proves judicial correctness would apply to another issue in the civil rights field, the liability of municipal corporations under § 1983. In 1961, we held that that statute did not reach municipalities. See *Monroe v. Pape,* 365 *U.S.* 167, 187 [81 *S.Ct.* 473, 484, 5 *L.Ed.*2d 492] (1961). Congress took no action to overturn our decision, but we ourselves did, in *Monell v. New York City Dept. of Social Services,* 436 *U.S.* 658, 663 [98 *S.Ct.* 2018, 2021–22, 56 *L.Ed.*2d 611] (1978). On the majority's logic, *Monell* was wrongly decided, since Congress' seventeen years of silence established that *Monroe* had not "misperceived the political will," and one could therefore "assume that [*Monroe's*] interpretation was correct." On the other hand, nine years have now gone by since *Monell,* and Congress *again* has not amended § 1983. Should we now "assume that [*Monell's*] interpretation was correct"? Rather, I think we should admit that vindication by congressional inaction is a canard. [480 *U.S.* at —— ——, 107 *S.Ct.* at 1472–73, 94 *L.Ed.*2d at 656–57.]

For these reasons, we hold that the Tax Court correctly reasoned that under the doctrines of probable legislative intent and common-sense plain meaning the oil companies may not deduct the W.P.T. in calculating net income for C.B.T. purposes.

## II

The characterization by the Director of the W.P.T. as a tax measured by "income" or "profits" is not an unusual or extreme conclusion. It is consistent with the conclusions reached by others and with oil industry economics.

A California decision construing the analogous phrase in the California corporation franchise tax, "taxes on or according to or measured by income or profits," concluded that the phrase included taxes on or measured by gross income. *MCA, Inc. v.*

*Franchise Tax Bd.,* 115 *Cal.App.*3d 185, 171 *Cal.Rptr.* 242, (Ct.App.1981) (taxes paid to foreign governments on gross film rents and gross record royalties not deductible). "The fact that such rents and royalties also constituted MCA's gross receipts [did] not make the taxes any less taxes measured by gross income." *Id.* at 192, 171 *Cal.Rptr.* at 246. As noted, the New York State Department of Taxation and Finance construed the identical phrase in the New York corporation franchise tax law against deductibility finding it a tax "on or measured by profits or income" whether labelled an excise tax, a property tax, or an income tax. *Supra* at 321. The Attorney General of South Carolina has concluded that the W.P.T. is a tax with respect to income that may not be deducted in computing income for South Carolina tax purposes. Opinion of the Attorney General, March 10, 1982, noted at *CCH State Tax Rptr.* (S.C.) ¶ 200–088.

The base and measure of the W.P.T. plainly fit the usual definitions of "income" and "profits." The W.P.T. is based on windfall profit. I.R.C. § 4986(a). The windfall profit is the difference between the removal or selling price and the adjusted base price plus severance tax adjustment. I.R.C. § 4988(a). The adjusted base price is essentially the price that could have been obtained for the oil under price controls, adjusted for inflation. The windfall profit cannot be equated with the market value of oil; it is a net amount, not simply the sales price, as in the case of federal transactional excise taxes.

The average adjusted base price, or actual costs, if more, were deductible by the oil companies from the sale price or fair market value of their crude oil to determine the measure and base of the W.P.T.. As explained by the State's economic expert, Dr. Vasquez, the existence of "income" for tax purposes does not require the deduction of all true economic costs. There are many provisions that are more arbitrary than the adjusted base price, having "little if any connection to economic cost." I.R.C. § 63(c) and § 1(f) (personal deduction); I.R.C. § 616(a) (expensing exploration and development costs); I.R.C. § 613(a) (excess of percentage over cost depletion); I.R.C. § 168

(the timing of depreciation deductions for accelerated cost recovery). The record before us and the opinion of Professor Deakin, another State's economic expert, show that the deduction of the adjusted base price permitted the recovery of all allowable costs for those oil companies that revealed such costs. Dr. Deakin's report, which stands essentially unchallenged in the record, stated:

21. The base price deduction, on average, more than compensates oil producers for costs incurred to produce the oil subject to the tax. The severance tax adjustment allows a deduction for the additional severance tax that arises as a result of the increase in the removal price of the oil as a result of price decontrol. This adjustment permits a dollar for dollar recovery of those incremental costs. Under price controls, base prices were supposed to permit economic recovery of crude oil. This means that the crude oil production operations must obtain at least a normal profit under price controls. If they did not, then producers would be expected to shut down operations and invest their money in other activities, all of which would be contrary to energy policy at the time. The prices allowed under price control should, therefore, permit a producer to recover production costs plus a reasonable return on production. To the extent that the prices in the price control system carried over to the Windfall Profit Tax as adjusted base prices, deduction of the adjusted base prices from revenue may be viewed as a deduction in lieu of itemizing production costs and normal profits. The Windfall Profit Tax itself is not included in the deductions to compute federal taxable income. To include either item in calculations of the tax base creates circularity.

22. Using the data available from published financial reports of these companies, it appears that the adjusted base prices exceeded average production costs (exclusive of Windfall Profit Tax) for all of the companies in this litigation. For example, in 1980, national adjusted base prices for the Windfall Profit ranged from $13.06 per barrel to $18.44 per barrel depending on the tier and the quarter. A survey of the annual reports of the companies showed that for 1980 the approximate average cost to produce an equivalent barrel of oil, exclusive of the Windfall Profit Tax but including depreciation, depletion and amortization, exploration costs, dry holes (when reported) and other costs to produce oil and gas ranged from $4.50 to $8.45 per barrel. Hence, on average, in 1980, these companies' costs were compensated for through the base price mechanism. In 1981, national adjusted base prices ranged from $14.47 to $20.81 per barrel, depending on the tier and the quarter in which the oil was produced. In 1981, the range of costs for the plaintiffs was between $7.49 and $13.48 per barrel. This analysis is based on costs reported according to generally accepted accounting principles and is subject to all the limitations that apply to such reports. Nonetheless, as a practical matter, the adjusted base price deduction appears to have the effect of allowing producers compensation for their average actual costs of production as those costs are measured under generally accepted accounting principles. Moreover, the difference between the

adjusted base prices and the average costs to produce is sufficiently large to allow compensation for some additional costs before the adjusted base price deduction would fail, on average, to compensate oil producers for their production costs. Indeed, the net income limitation provisions allow for those cases where the adjusted base price does not adequately cover the costs to produce oil.

Thus the tax is based on profits.

As well stated by a California appellate court

The [W.P.T.] statute imposes an excise tax *on profit* and furnishes the mechanics by which the profit and the tax are to be calculated. Had Congress desired to impose a tax on removal, other language would have been used. [*Crocker Nat'l Bank v. McFarland Energy, Inc.*, 140 *Cal.App.*3d 6, 189 *Cal.Rptr.* 302, 304 (Ct.App.1983) (emphasis added).]

*See also Lewis v. Reagan*, 516 *F.Supp.* 548, 553 (D.D.C.1981) ("The Windfall Profit Tax taxes the increased *income* that will accrue to the owners of domestic oil properties after the lifting of price controls.") (emphasis supplied); *United States v. Ptasynski, supra*, 462 *U.S.* at 103, 103 *S.Ct.* at 2255, 76 *L.Ed.* 2d at 436 ("[Congress] perceived that the decontrol legislation would result—in certain circumstances—in profits essentially unrelated to the objective of the program, *and concluded that these profits should be taxed.*") (emphasis added).

Many sections in the W.P.T. are intended to limit its tax base, not just to income but to that increment of income representing the excess of the uncontrolled price of oil over the controlled price. Further as Professor Deakin points out, we must assume that the controlled price permitted the recovery of the producer's costs or that a particular unprofitable field would have been abandoned by a prudent producer before decontrol. The adjusted base price equates roughly with the controlled price of oil in 1979. I.R.C. § 4989(c). The inflation adjustment is also cost motivated. I.R.C. § 4989(b). The severance tax adjustment, I.R.C. § 4988(a) and I.R.C. § 4996(c), insures that the base and measure of the W.P.T. excludes one of the major costs associated with decontrol—State severance taxes imposed on the incremental value of crude oil resulting from decontrol.

Congress' intention that the base of the W.P.T. allow a producer to recover production costs before taxation is most

persuasively shown by the net income limitation (NIL) provi-
sion. I.R.C. § 4988. The purpose of the provision was to
"prevent the tax from burdening high cost properties ... where
the net income per barrel is less than the windfall profit."
(House Report at 2; Senate Report at 29). (H.R.Rep. No.
96–304, 96th Cong. 1st Sess. 1980 U.S.Code Cong. & Ad.News
589; S.Rep. No. 96–394, 96th Cong. 1st Sess. 29 (1979) 1980
U.S.Code Cong. & Ad.News 438, 439).

Computation of the net income per barrel is based upon the
computations of gross income and taxable income used to
determine percentage depletion for federal income tax pur-
poses. I.R.C. § 4988(b)(3). Gross income from a property is
determined under *Treas.Reg.* § 1.613–3, reprinted in *CCH Fed-
eral Tax Rptr.* 1987 Vol. 5, ¶ 3557C. This regulation helps
determine gross income from the oil and gas well for I.R.C.
§ 613(a) and (c)(1) when the oil is not sold but is refined or
converted by the same oil company. The regulation is used to
determine gross income for purposes of computing percentage
depletion—either the selling price in the immediate vicinity of
the well, or, if the oil is not sold on the premises, the "repre-
sentative market or field price before conversion or transporta-
tion." The latter price equates generally with the removal
price under the W.P.T. when oil is not sold on the premises.
Compare I.R.C. § 4988(b)(3) with I.R.C. § 4988(c)(3), both refer-
enced to I.R.C. § 613. Taxable income is the gross income
from the property less the expenses set forth in the regulation,
including operating expenses, certain sales costs, administrative
and financial overhead, depreciation, taxes deductible under
§ 162 or § 164, (except the W.P.T.), losses, and exploration and
development expenditures. I.R.C. § 4988(b)(3); *Treas.Reg.*
§ 1.613–3. These expenses are a producer's actual expenses
incurred on or allocable to a particular property. The process
of calculation of the net income or taxable income when the
N.I.L. is employed is described in Shurtz, *"The Windfall Profit
Tax—Poor Tax Policy? Poor Energy Policy?"* 34 *U.Miami
L.Rev.* 1115, 1142–43 (1980).

The net income or taxable income under section 4988(b) is calculated as it is under section 613(a), relating to percentage depletion, but with certain modifications. Taxable income from the property equals gross income less allowable deductions. Deductible items include operating expenses, certain selling expenses, administrative and financial overhead, depreciation, deductible taxes, losses sustained, intangible drilling and development costs, exploration and development expenditures, and other similar expenditures. For purposes of section 4988(b), this taxable income is calculated as in section 613 but without deductions for intangible drilling and development costs or the windfall profit tax. In lieu of these deductions, the Act allows an imputed cost depletion deduction, the calculation of which depends on whether the producer uses percentage or cost depletion. If a producer actually capitalizes intangible drilling costs for income tax purposes, he may reduce his taxable income from the property by the amount of the deduction under section 611 (either as cost depletion or as depreciation). If the producer used percentage depletion for the property for all periods during which he owned an economic interest in it, the producer's taxable income is reduced for cost depletion, which would have been allowable if all intangible drilling costs incurred by the taxpayer on the property had been capitalized and taken into account in computing the depletion. In contrast to the provisions of the House and Senate Reports, the Act allows the producer to treat qualified tertiary injectant costs as if they had been capitalized and recovered through cost depletion.

Despite the contrary suggestion by certain of the oil companies, cost depletion is allowed in determining net income. See I.R.C. § 4988(b)(3)(C). The W.P.T. itself is not allowed as a deduction in calculating the W.P.T. base. This is not surprising since the purpose of the net income computation is to determine the tax base for the W.P.T. To allow a deduction in the tax base for the tax itself would be circular. Under I.R.C. § 4988(b)(3)(C) such costs are deductible over time because they are included in the capitalized cost of the property for W.P.T. cost depletion purposes.

Hess mischaracterizes the N.I.L. in claiming that it is only a limitation on and does not define the base of the W.P.T. When the N.I.L. is invoked, the base for imposing the W.P.T. becomes 90% of the net income per barrel. As stated by Texaco's tax attorney, the W.P.T. is imposed on the "smaller" of the windfall profit or the net income per barrel. Alleged infrequent use of the N.I.L. during 1980 and 1981 as proof that it does not limit the tax base to net income, as urged by the Atlantic oil companies, is not persuasive. During the "phased decontrol"

period, 1980, the N.I.L. substantially reduced the oil companies' W.P.T. liability. In 1980 all but one of the plaintiff oil companies computed the tax based upon the net income from the property on between 14% and about 73% of their respective production. The effect was less pronounced in 1981. The dollar reduction in tax liability for the various oil companies resulting from use of the N.I.L. ranged from 21% to 45% in 1980 to 3% to 13% in 1981 and totaled $1,685,465,293 for these two years. The reason the N.I.L. was not used more frequently was that often the windfall profit was smaller than the net income base. In these cases, the deduction for the adjusted base price plus incremental severance taxes exceeded the oil companies' actual costs.

■ As the Director's expert Vasquez points out, the absence of absolute economic symmetry in a tax scheme is no ground to dismiss it as irrational, illogical or misdescribed. He stated:

> The plaintiffs argue that income implies a "gain," which in turn implies that the tax base is gross income less allowable deductions for cost. The plaintiffs argue that the Windfall Profit Tax is based solely on the value of oil above some threshold without reference to the cost of producing the oil.

> This assertion is wrong; the Windfall Profit Tax does in fact recognize cost. The higher of the adjusted base price or cost computed for the net income limitation is allowed as a deduction in computing income for purpose of the Windfall Profit Tax. The adjusted base price does not equal economic costs. However, under the current Federal individual and corporate income tax structures, the measure of income includes allowances for costs that are often just as arbitrary as allowing a deduction for the "adjusted base price." If the arbitrariness of deductions from income is grounds for declaring that the resulting net amount is not income for tax purposes, then the base of the corporate and individual income taxes fails to qualify as income on the same grounds.

> One example of the arbitrariness of allowable deductions is the zero bracket amount allowed individuals. The zero bracket amount allows a deduction from gross income that is not based on any notion of cost or outlay. Independent of the income spent on medical expenses, interest, state and local taxes, union dues or other allowable itemized deductions, a taxpayer is simply allowed to deduct an amount that was legislated by Congress. Similar to the adjusted base price, the zero bracket amount will increase with inflation starting in 1985.

Despite this legislated deduction, the individual income tax is viewed by most analysts as a tax based on income.

We agree.

■ Under ordinary dictionary definitions of "income," *i.e.*, all that comes in without regard to expenditures, the windfall profit clearly constitutes "income." The windfall profit also meets a more restrictive definition, *i.e.*, gross receipts less costs of goods sold, because the deduction for the adjusted base price plus severance tax adjustments permits more than the deduction of getting the oil out of the ground (producer's cost of goods), and in cases where the windfall profit exceeds 90% of the net income per barrel, the tax base becomes the lower amount, 90% of net income. Even if the term "profits" is given its most restrictive meaning, *i.e.*, revenue less expenses, the base of the W.P.T. is within the definition because the N.I.L. permits the deduction of all reasonably allocable expenses before arriving at net income. Because the tax is reasonably geared to establishing realized or realizable gain at an easily-measured stage, we reject the oil companies' contention that there must be immediate realization from a sale or exchange, a netting of ultimate gains or losses of an integrated company, a computation of an integrated entrepreneur's income or profit, or an annual or other periodic computation. The Director's decision that the oil companies experienced a realization of income or profit upon extraction of crude oil at the wellhead is amply supported in this record and by common sense. It is very unlikely, if not realistically impossible, given the structure of the W.P.T. and the market conditions under which it was imposed, that any integrated oil company producer would both pay the W.P.T. and suffer a net loss at the end of an annual period, and this was hardly the experience of the parties before us.

### III

There is adequate support in the record for the conclusion that the windfall profit tax qualifies as a tax on "income" or

"profit" in the economic sense. The Director's expert, Dr. Vasquez, reported that of the three necessary ingredients postulated by plaintiffs—realization, cost recovery, and time—only one, deduction for costs, was necessary to satisfy the economic definition of income. He also concluded that no existing federal tax would qualify as a tax on income if deductions for true economic costs were required as a strict test. Under the W.P.T. the deduction for the greater of the adjusted base price or actual costs under the N.I.L. is as accurate a representation of true costs as many of the deductions in the I.R.C. for other income tax purposes. For example, he explained that in the case of oil producers, the deduction for the excess of percentage over cost depletion, I.R.C. § 613(a), bears no relation to actual cost. Dr. Vasquez also observed that since economic income may be computed on "an accrual basis" without a sale, contemporaneous realization is not required. He concluded that while the deduction for the adjusted base price under the W.P.T. may be an arbitrary allowance for costs, it is no more arbitrary than the zero bracket amount, the expensing of exploration and development costs, and percentage depletion. He noted that the N.I.L. computation recognized costs in an economic sense—thus, the base and measure of the W.P.T., the lesser of the windfall profit per barrel or 90% of the net income per barrel, satisfied economic concepts of income as well as does the tax base for the conventional federal individual and corporate income tax satisfied such concepts.

■ In the Tax Court, the oil companies made no attempt to counter these opinions of the State's economists. They simply argued that the court should adopt the two other theories of income, realization and a flow of money accruing within a fixed temporal period. Where there is a rational basis in the record for the economic conclusion inferred from the facts, an appellate court may affirm. We cannot in any sense say that the factual conclusion of the Director and the decision of the Tax Court that the tax in fact was levied here on "profit" and "income" was arbitrary, capricious, unreasonable, or unsup-

ported by substantial credible evidence in the record as a whole. *See Henry v. Rahway State Prison*, 81 *N.J.* 571, 579–80 (1980).

Among the early federal income tax decisions relied upon by the plaintiffs is *Eisner v. Macomber*, 252 *U.S.* 189, 40 *S.Ct.* 189, 64 *L.Ed.* 521 (1920). In determining that a common stock dividend paid on common stock was not income, the Court defined income as " 'the gain derived from capital, from labor, or from both combined,' provided it be understood to include profit gained through a sale or conversion of capital assets. . . ." 252 *U.S.* at 207, 40 *S.Ct.* at 193. The Court went on to state that income must be "something of exchangeable value . . . severed from the capital . . . and . . . received or drawn by the recipient (the taxpayer), for his separate use, benefit and disposal. . . ." *Ibid.* The receipt of a stock dividend did not permit the taxpayer to withdraw any part of his capital; rather, his investment remained "subject to the risks of the enterprise." *Id.* at 208, 40 *S.Ct.* at 194. The Court concluded that a taxpayer does not realize income if, "every dollar of his original investment, together with whatever accretions and accumulations have resulted from employment of his money . . . still remains . . . subject to business risks which may result in wiping out the entire investment." *Id.* at 211, 40 *S.Ct.* at 195.

The lifting of crude oil meets even the strict requirements of the *Macomber* definition of realization, including the requirement of conversion. When lifted to the surface and captured, the oil has been "severed" from the capital. It is no longer part of a deposit of unknown quantity several thousand feet down in the earth. As Professor Deakins noted, it has a fixed exchangeable value tied to a posted price system. The producer receives it for his separate use and benefit. The business risks have fundamentally changed; the producer's entire investment is unlikely to be wiped out. There has been a "conversion of capital assets" from an indeterminable underground deposit to a fungible, readily marketable product. (Deakin Report at 21). The *Macomber* requirement has since been modified. *See United States v. Kirby Lumber Co.*, 284 *U.S.* 1, 52 *S.Ct.* 4, 76

*L.Ed.* 131 (1931) (Gain to corporation by redeeming bonds at a price less than par value).

Lifting crude oil completes the production process and therefore constitutes "the completion of a transaction." *Helvering v. Bruun*, 309 *U.S.* 461, 469, 60 *S.Ct.* 631, 634, 84 *L.Ed.* 864, 869 (1940). While there may be no sale, the value of the oil is plainly "ascertainable." Posted prices

> control the amounts at which crude oil passes from hand to hand in the fields to which they relate. They are a bonafide competitive price, not subject to manipulation or rigging, for the reason, aside from others, that their maintenance is effectively policed by state regulatory bodies and also by state and Federal taxing authorities in connection with enforcement of taxing statutes. [*Skelly Oil Co. v. Commissioner of Taxation*, 269 *Minn.* 351, 131 *N.W.*2d 632, 636 (1964).]

The fact that the posted price may fall subsequent to the lifting of the oil or that some barrels may be lost following severance from the lease is irrelevant. The fact that some of the plaintiffs subsequently lose barrels of oil and are not entitled to refunds of W.P.T. in respect of such losses does not impugn the fact that oil production income is realized when the oil is lifted. According to this record these "downstream" losses are minimal, in fact less than .2% of production plus purchases of crude oil. The posted price fixes the value of the oil at the point of lifting. Later events do not detract from this fact (Deakin Report at 20).

Following production or lifting of crude oil, plaintiffs either sell the oil to third parties, exchange it with third parties, or transfer it to the refining division of their integrated businesses. For example, as a percentage of crude oil produced by the eleven Atlantic plaintiffs plus crude oil acquired after lifting from other companies, the Atlantic plaintiffs sold at the crude oil stage without refinement between 0% and 53% of their total barrels and exchanged between 0% and 84%. Every Atlantic plaintiff either sold or exchanged some amount of oil at the crude oil stage before refinement.

## IV

The fact that the W.P.T. has been labeled or termed an excise tax (I.R.C. § 4986(a)) does not prevent it from being a tax on or measured by income or profits. There are other federal excise taxes measured by income in Subtitle D—Miscellaneous Excise Taxes. I.R.C. § 4981 (excise tax on the undistributed taxable income of real estate investment trusts); I.R.C. § 4940 (excise tax on investment income of private foundations).

State taxes that are denominated franchise or excise taxes are often measured by income. The New Jersey corporation business tax itself is a franchise or excise tax measured in part by income. *Cities Service Co. v. Director, Div. of Taxation,* 5 *N.J.Tax* 257, 271 (1983). The savings institution tax, *N.J.S.A.* 54:10D–1 to –10D–18, is stated to be an excise tax measured by net income. *N.J.S.A.* 54:10D–3; *see also Commissioner of Rev. v. Massachusetts Mutual Life Ins. Co.,* 384 *Mass.* 607, 428 *N.E.*2d 297 (1981).

Thus, despite Texaco's arguments to the contrary, the fact that the W.P.T. may be denominated an excise tax (I.R.C. § 4986) does not determine whether it falls within the statutory disallowance for taxes "on or measured by profits or income." The label appended to the tax is not conclusive. Indeed, it has been suggested that "income" for purposes of an excise tax may differ from "income" as conceived under an income tax. *Commissioner of Revenue v. Massachusetts Mut. Life Ins. Co., supra,* 428 *N.E.*2d at 301 (Massachusetts excise tax measured by gross investment income could include in the measure of the tax items such as imputed home office rent which would not be income in the traditional sense); *Polaroid Corp. v. Commissioner of Revenue,* 393 *Mass.* 490, 472 *N.E.*2d 259, 264 n. 10 (1984). Under such a view, the fact that the W.P.T. is an excise tax supports rather than detracts from the conclusion that it is "on or measured by profits or income." *See Crocker Nat'l Bank v. McFarland Energy Inc.,* 140 *Cal.App.*3d 6, 189 *Cal.Rptr.* 302 (Ct.App.1983), where the court stated

> The [W.P.T.] statute imposes an excise tax on profit and furnishes the mechanics by which the profit and the tax are to be calculated. Had Congress desired to impose a tax on removal, other language would have been used. [*Id.* at 10, 189 *Cal.Rptr.* at 304.]

In dismissing a taxpayer's suit under the Anti-Injunction Act, the court in *Lewis v. Reagan, supra,* 516 *F.Supp.* at 552, noted that "The W.P.T. taxes the increased income that will accrue to the owners of domestic oil properties after the lifting of price controls."

As the Tax Court properly stated, "The precise issue in this litigation is whether the crude oil windfall profit tax is a tax 'on or measured by profits or income' *within the intent of the Corporation Business Tax Act." Amerada I,* 7 *N.J.Tax* at 54. Many federal legislators viewed the W.P.T. as exacted on profits. The House and Senate Committee Reports both stated that the tax will reduce the profits of the oil companies. *House Report* at 2, 1980 U.S.Code Cong. & Ad.News 589, 590; *Senate Report* at 2, 1980 U.S.Code Cong. & Ad.News 413, 414. Expressing their additional views, Senators Ribicoff, Nelson, Moynihan, Baucus, Bradley, Packwood, Roth, Danforth, Chafee, Heinz and Durenberger stated concerning the increases in world oil prices:

> Here, we believe, there is a huge "windfall" to producers; presumably, this oil was profitable at $6 and will be over 400 percent more profitable after decontrol....
>
> Oil companies do not need to keep all the windfall profits from prior investments as an incentive to explain exploration and production, as long as they are assured of higher prices. According to their third quarter reports, cash flow is not a problem for most oil companies. Even under the committee bill, decontrol will add $374 billion to oil producers' net revenues over the next ten years [*Senate Report* at 132–33, 1980 U.S.Cong. & Ad.News 538.]

In like vein, Senator Matsunaga stated

> While producers enjoy the windfall profits that will accrue because of cartel pricing, it is only fair that they should share this windfall profit with the Nation. [*Senate Report* at 162, 1980 U.S.Cong. & Ad.News 565.]

Numerous other Congressmen viewed the W.P.T. as a tax on profits. *See* 125 *Cong.Rec.* H17141 (Rep. Lederer); 125 *Cong. Rec.* H17141 (Rep. Shannon); 125 *Cong.Rec.* H17151 (Rep. Ullman); 125 *Cong.Rec.* H17152 (Rep. Harris).

## V

We reject the balance of the oil companies' additional contentions on this appeal for these reasons.

■ 1. Amerada Hess (Hess) asserts as its main argument that because the statutory disallowance for taxes on income and profits was added to the New York franchise tax to cover the federal income and federal excess profits tax, the disallowance in the C.B.T. can apply only to those taxes or to taxes that Hess equates with those taxes that in its view do not include the W.P.T. But Hess' argument overlooks the basic point that the reach of a statute is not limited to situations existing at the time of its adoption. *Radiofone Corp. of N.J. v. Director, Div. of Taxation,* 4 *N.J.Tax* 420, 430 (1982). As noted, the New York State Department of Taxation and Finance is in agreement with our view. Its official position is to disallow a deduction for the W.P.T. in determining entire net income under the New York analogue to New Jersey's CBT. *Supra.* at n. 1. We agree with the Attorney General's observation that ultimately "the whole excursion into New York legislative history is beside the point." The language in the New Jersey C.B.T.— "taxes on or measured by profits or income"—is on its face sufficiently broad to include taxes other than the federal income tax and federal excess profits tax. Resort to New York legislative history is not helpful and surely not determinative.

■ 2. The Atlantic plaintiffs urge that since the Director would not permit separate accounting in determining plaintiffs' entire net income, he cannot deny a deduction for the W.P.T. which they contend is measured by segmenting income or profit, that is, the income or profits from plaintiffs' exploration and production divisions. These plaintiffs assert that such an asymmetrical construction of *N.J.S.A.* 54:10A–4(k) is not permissible because *N.J.S.A.* 54:10A–4, –5, and –6 should be construed "in *pari materia,*" citing *American Tel. & Tel. Co. v. Director, Div. of Taxation,* 4 *N.J.Tax* 638 (1982), aff'd, 194 *N.J.Super.* 168 (App.Div.1984). We disagree. That case had

nothing to do with a deduction claimed in arriving at entire net income. The court was there concerned with the inclusion of income items in subsection 4 and the inclusion of gross receipt items in subsection 6. Where, as here, the issue is the allowability of a claimed deduction and not the inclusion or exclusion of income from the tax base, there is not logical compulsion requiring a symmetrical computation with the receipts' fraction.

3. The Atlantic plaintiffs assert that the addition of the W.P.T. to the net income base of the C.B.T. results in a distortion between the base, which they contend now includes an item of unearned income, and the receipts factor of the apportionment fraction, which includes only earned receipts. Denial of a deduction for the W.P.T. may augment the entire net income by the amount disallowed but this does not add unrealized income to the base. Whether a deduction is allowed or disallowed in arriving at entire net income does not change the nature of plaintiffs' receipts, which are still realized. We find no precedent or justification for plaintiffs' contention that the disallowance provision applies only to federal taxes directed at the same income base as the C.B.T.

4. We reject the contention that denial of a deduction for the W.P.T. violates the Due Process Clause. Plaintiffs are concededly unitary businesses. New Jersey is entitled to include in their respective tax bases 100% of each companies' entire net income. The reduction of that base to reflect constitutionally taxable income attributable to New Jersey activities is accomplished by the three-factor apportionment formula. *Silent Hoist & Crane v. Director, Div. of Taxation,* 100 *N.J.* 1, 7 (1985). As the Tax Court properly noted, "[T]he question here is only whether plaintiffs may claim a deduction from their net income tax base, not whether there should be an addition to that portion of the tax base." *Amerada I,* 7 *N.J.Tax* at 57.

Denial of the W.P.T. deduction does not violate the Commerce Clause because it does not favor in-state over out-of-state economic activity. *See Commonwealth Edison Co. v.*

*Montana,* 453 *U.S.* 609, 101 *S.Ct.* 2946, 69 *L.Ed.*2d 884 (1981); *Exxon Corp. v. Governor of Maryland,* 437 *U.S.* 117, 98 *S.Ct.* 2207, 57 *L.Ed.*2d 91 (1978). Because the denial of a deduction for the W.P.T. was not based on the interstate nature of plaintiffs' businesses and did not burden out-of-state companies, consumers, or transactions while favoring in-state activities, the disallowance did not discriminate against interstate commerce. Nor does the disallowance overcome the strong presumption of constitutionality confronting the plaintiffs' equal-protection-clause attack. *Lehnhausen v. Lakeshore Auto Parts Co.,* 410 *U.S.* 356, 359, 93 *S.Ct.* 1001, 1003, 35 *L.Ed.*2d 351, 354–355 (1973). Plaintiffs are denied a deduction because they produce crude oil and pay the W.P.T. The fact that they are disallowed the deduction while non-oil-producing petroleum marketers are not affected is because non-oil-producing marketers do not pay the W.P.T. Moreover, the nonproducing marketers did not benefit, as did plaintiffs, from the decontrol of crude oil prices, but had to purchase their crude oil at the higher decontrolled prices.

5. Finally, we reject the contention that denial of a deduction violates the Supremacy Clause of the U.S. Constitution by thwarting federal energy revenue policies. There is no substantial connection between disallowance of the deduction and the accomplishment of the policies. Although the legislative history suggests an assumption that the tax would generally be deductible for state income tax purposes, there is not a shred of evidence that such treatment was a mandatory or integral part of the over-all federal policies motivating passage of the legislation. We find no readily apparent conflict with any federal law or any expressed or clearly implied federal policy. *See Armstrong v. Director, Div. of Taxation,* 5 *N.J.Tax* 117, 131 (1983), aff'd *o.b.,* 6 *N.J.Tax* 447 (App.Div.1984). We will not presume such a conflict.

We reverse the judgment of the Appellate Division and reinstate the judgment of the Tax Court.

*For reversal* —Justices CLIFFORD, HANDLER, O'HERN, STEIN and KING—5.

*For affirmance*—None.