267 N.J. Super. 237 (1992)
631 A.2d 158
JAMES AND LINDA CHRISTIAN, PLAINTIFFS,
v.
JAMES E. ORMSBY AND NEW JERSEY AUTOMOBILE FULL INSURANCE UNDERWRITING ASSOCIATION, DEFENDANTS.
Superior Court of New Jersey, Law Division Essex County.
Decided December 18, 1992.
*240 Louis W. Childress for Plaintiffs (Brown & Childress, attorneys).
Frank A. Viscomi for Defendant New Jersey Automobile Full Insurance Underwriting Association (Elliot N. Fabricant, attorney).
SCHWARTZ, J.S.C.
This case involves a determination of the validity of a notice of cancellation for non-payment of premiums of an automobile insurance policy issued by Liberty Mutual Insurance Company ("Liberty Mutual") as servicing carrier for the New Jersey Automobile *241 Full Insurance Underwriting Association ("JUA" or "defendant") to the plaintiffs James and Linda Christian. The insurer seeks further clarification of the methods by which proof of compliance with the requirements of N.J.S.A. 17:29C-10 for the mailing of a notice of cancellation may be satisfied. A second issue requiring resolution is whether an automobile insurer may, pursuant to N.J.S.A. 17:29C-8, issue to its insured, prior to the premium due date, a notice of cancellation effective the day following the premium due date. This latter issue appears to be one of first impression in New Jersey.
At the outset of the trial, a motion was granted to substitute the JUA for Liberty Mutual as the defendant to the fourth count of the complaint seeking declaratory judgment. That motion to amend was granted pursuant to R. 4:9-2. The answer of Liberty Mutual was also deemed amended to substitute the JUA for Liberty Mutual. On plaintiff's motion the sixth count of the complaint which charges defendant, John Randolph ("Randolph"), the broker through whom plaintiffs purchased the policy in issue, with negligence, was dismissed with prejudice.
This matter was tried to the court without a jury. Three witnesses testified at the trial. These witnesses included the plaintiff, Linda Christian ("Mrs. Christian"), Christopher Brewer ("Brewer"), the production supervisor for Liberty Mutual and the broker, Randolph. In reaching the findings of the fact set forth below, the court has had to evaluate the credibility of these witnesses.
During the period between May 1985 and February 1988 plaintiffs resided at 24 Valley Street, Newark, New Jersey. In early 1988 plaintiffs, who then owned a 1973 American Gremlin, secured an automobile insurance policy through Randolph from Liberty Mutual, acting as servicing carrier for the JUA. The policy insured the Gremlin for the period February 28, 1987, through February 28, 1988 (Exhibit P-2).
On October 7, 1987, Mrs. Christian signed a contract for the purchase of a 1987 Oldsmobile Ciera coupe. Upon execution of *242 the contract of purchase Mrs. Christian, at the recommendation of the car salesman, called Randolph's office to ask that the new car be added to her existing insurance policy. She spoke with "Phyliss," a clerical employee of Randolph, and later went to Randolph's office and picked up a temporary insurance identification card for the Oldsmobile (Exhibit P-5). The temporary I.D. card, which was issued in the name of James Christian ("Mr. Christian"), stated that the effective date of coverage for the Oldsmobile was October 7, 1987. On that date Randolph sent a request for policy change to Liberty Mutual seeking to add the 1987 Oldsmobile to plaintiffs' policy (Exhibit P-4). Pursuant to that request for policy change, Liberty Mutual issued a policy endorsement (Endorsement # 3), adding the 1987 Oldsmobile Ciera as the second automobile on the policy and listing United Jersey Bank as the loss payee (Exhibit P-6). The effective date of Endorsement # 3 was October 7, 1987.
When Mrs. Christian went to Randolph's office to obtain the temporary insurance I.D. card, she inquired about payment of the premium and was told by Randolph's secretary, Phyliss, not to worry about payment of the premium at that time. Phyliss informed Mrs. Christian that she would be receiving a premium notice from the company informing her as to the amount of the additional premium and the premium due date. During that conversation Phyliss did not inform Mrs. Christian as to the amount of the premium which would be due for the Oldsmobile or its due date.
Mr. Christian was involved in an automobile accident on November 13, 1987, while driving the 1987 Oldsmobile during the course of which he suffered bodily injuries. Mr. Christian has commenced this litigation against the other driver, James E. Ormsby, and has himself been named a defendant in a separate consolidated action commenced by Ebon Blackson ("Blackson"), a passenger in Mr. Christian's vehicle, in which Blackson seeks damages for bodily injuries sustained in the November 13, 1987, accident.
*243 In their amended complaint plaintiffs seek an declaration that they are covered under the policy issued by Liberty Mutual on behalf of the JUA for personal injury protection ("PIP") benefits arising as a result of the injuries sustained by plaintiff James Christian in the November 13 accident, as well as for collision damages to the 1987 Oldsmobile.[1]
The JUA in its answer denies any liability to plaintiff and asserts as its primary defense cancellation of the policy for non-payment of premium prior to the date of the November 13, 1987, accident.
Mrs. Christian testified that she never received a copy of the premium notice (Exhibit P-8) alleged to have been issued and mailed on or about October 21, 1987, and providing for a payment of $362 in premiums on November 10, 1987. Mrs. Christian also denied having received the cancellation notice dated October 22, 1987, effective November 11, 1987 (Exhibit P-9; Exhibit D-7), and alleged to have been mailed from the Boston, Massachusetts, post office on October 26, 1987 (Exhibit D-1). Mrs. Christian testified *244 that she received the premium notice (Exhibit P-8) from Randolph's secretary Phyliss the day she delivered the police accident report to her following the November 13 accident. The premium notice marked into evidence as Exhibit P-8 is addressed to John Randolph at his then address at 976 Eighteenth Avenue, Newark, New Jersey. There is no address for James Christian, whose name appears on that premium notice. Based upon Randolph's testimony the court finds that Exhibit P-8 is the producer's copy of the premium notice, rather than the policyholder's copy of that premium notice.
Another copy of the premium bill marked Exhibit D-5 was produced from the files of John Randolph. That premium notice bears the name and address of James Christian on the left side and Randolph's name and address on the right side. Mrs. Christian also denied having ever seen or received Exhibit D-5. Randolph testified that he also sent plaintiffs his own notice, (Exhibit D-6) dated November 5, 1987, notifying Mr. Christian that Randolph had just received a notice cancelling the policy for non-payment of premium effective November 10, 1987, and requesting that Mr. Christian send him a check "today." Mrs. Christian denied receiving the original of that notice as well.
Randolph's testimony with regard to these two premium notices was contradictory. He initially testified that Exhibit D-5 was the premium notice received in his office and that he had taken it out of his file to deliver to counsel for the JUA; that Exhibit P-8 was the original of the premium bill sent to James Christian and that he had not seen Exhibit P-8 prior to the trial. However, on cross-examination, he testified that he did not know how he obtained both copies of the premium notice and did not recall giving Exhibit P-8, which would be the producer's or broker's copy of the premium notice, to Mrs. Christian and did not know whether anyone in his office provided Mr. or Mrs. Christian with Exhibit P-8. However, Randolph testified that the premium notice is mailed in a window envelope with the address showing through the window; that he opens the mail delivered to his office; and *245 that he did not recall receiving the policyholder's copy of the premium notice in the same envelope as the producer's copy of that premium notice.
Two possible inferences can be drawn from the circumstances surrounding the presence of the policyholder's copy of the premium notice in Randolph's file. They are: (1) that Randolph's recollection was in incorrect and that in fact he received the policyholder's copy of the premium notice in the same envelope as the producer's copy of the premium notice or that it was otherwise mistakenly delivered to him with other mail he received from Liberty Mutual; or (2) that the policyholder's copy of the premium notice was delivered by Mrs. Christian to Randolph's office sometime after the accident in question, was left at his office and was placed loose into the file by Randolph's secretary. The court concludes that the latter inference is more probable than the former for the following reasons.
All of the documents removed from Randolph's file and marked into evidence in this matter contained double hole punches at the top or along the left-hand margin so that each document could be inserted into an "Acco" binder clip which held Randolph's file together. The single exception to that practice was Exhibit D-5 which contained no hole punches. Secondly, Exhibit D-5 contains the words "Old Stuff". These words were apparently written on Exhibit D-5 by Randolph or someone in his office. The words "Old Stuff" clearly infer that the policyholder's copy of the premium notice was received by Randolph some time after he received the producer's copy of that premium notice and since the premium notice was addressed to James Christian at his address in Newark, it is reasonable to infer that the policyholder's copy of that premium notice was delivered or mailed to Randolph by Mr. or Mrs. Christian some time after the November 13 accident. Accordingly, the court concludes that plaintiffs received the premium notice from Liberty Mutual in the ordinary course of the mails sometime after October 21, 1987, and substantially prior to November *246 10, 1987, and that the testimony of Mrs. Christian to the contrary must be rejected as not credible.
The credibility of Mrs. Christian's denials of her receipt of the Liberty Mutual cancellation notice and the notice from Randolph concerning cancellation of the policy must be evaluated both upon the basis of her demeanor on the witness stand and in light of the testimony provided by Brewer and Randolph. Their testimony is summarized below.
Brewer, as production supervisor for Liberty Mutual at present and in November 1987, has the duty to make sure that all billing and cancellation notices go out on timely basis. He testified that all cancellation notices were computer generated on the third shift in a department called "Computer Operations." Exhibit D-4 is an unused combination of the data mailers and the company's file copies of cancellation notices which was offered in evidence to illustrate the procedures followed by Liberty Mutual. This form contains a green top page which represents the Liberty Mutual file copy of the cancellation notice. Immediately underneath the top page is an envelope and the policyholder's copy of the cancellation notice is located inside the envelope or data mailer. The form is carbonized and an impact printer prints out the name and address of the policyholder, the name and address of the agent, the date of the notice, the policy number, the effective date of cancellation and the minimum amount of premium due. Because the forms are carbonized, one typing is made to the Liberty Mutual file copy and the information is transferred through the carbonized interior of the top of the envelope to the cancellation notice inside the envelope. The name and address of the policyholder is printed on the right-hand side of the envelope as well as on the right-hand side of the cancellation notice. On the left-hand side of the policyholder's copy of the cancellation there is printed the name and address of the broker or agent through whom the policy was purchased.
Pursuant to Liberty Mutual's procedures, a second copy of the cancellation notice is sent to the broker or agent. The broker's *247 copy of the cancellation notice is printed by the impact printer at the same time that the Liberty Mutual file copy of the broker's copy of the notice is printed and immediately following the printing of the policyholder's copy of cancellation notice. The broker's or agent's copy of the cancellation notice is also located inside a data mailer envelope addressed to the broker or agent. The only difference between the broker's copy and the policyholder's copy of the cancellation notice is that on the broker's copy, the broker's name and address appears on the right-hand side and the policyholder's name and address appears on the left-hand side of the cancellation notice. The cancellation notices are never removed from the mailing envelopes before the envelopes containing those notices are placed in the mail.
Liberty Mutual retains in continuous form all of the computer generated file copies of the cancellation notices mailed to policy holders and brokers in each state for each date of mailing. Exhibit D-3 contains all of the Liberty Mutual file copies of the cancellation notices dated October 22, 1987, and mailed to the State of New Jersey on October 26, 1987. Exhibit D-3 contains Liberty Mutual's file copies of 573 cancellation notices mailed on October 26, 1987, to the State of New Jersey. Included in this continuous form are copies of the cancellation notices mailed to James Christian and John Randolph with respect to policy number AB9-339-124908-007 5. The company's file copies of these cancellation notices indicate that plaintiffs' policy had been issued by Liberty Mutual on behalf of the JUA.
At the same time as the cancellation notices are computer generated and printed, a document identified by Brewer as a "hereby" is also computer generated. That document (Exhibit D-2) lists the names and addresses of all policyholders, brokers and agents and the policy numbers of all policies for which cancellation notices were computer generated that date. Exhibit D-2 contains a certification at the top which states "I hereby verify that the items received by me for mailing are the same items listed below". Underneath the certification is a form number CR108 and the title *248 "Certificate of Mailing." The "hereby" is not signed, but attached to the "hereby" is a certificate of mailing bearing the initials of the postal clerk who receives the envelopes containing the cancellation notices. Among the names listed in the "hereby" (Exhibit D-2) is the name and address of "James Christian, 24 Valley Street, Newark, New Jersey," immediately followed by that of "John C. Randolph, 976 Eighteenth Avenue, Newark, New Jersey".
Brewer testified that each of the envelopes containing a cancellation notice is placed through a bursting machine which bursts each of the data mailers apart for mailing purposes. Brewer assures that the names and addresses on the data mailers are the same as the names and addresses on the "hereby" by having two employees under his supervision match up the first and last names on the "hereby" with the names on the first and last data mailer.
Brewer testified that 573 cancellation notices were generated on October 22, 1987, by the computer department for mailing to the State of New Jersey. Once the mailing department received all of the cancellation notices, his department puts together the certification of mailing (Exhibit D-1) attached to the "hereby." The certificate of mailing form is obtained from the post office and is filled out both by an employee in the Liberty Mutual mailing department and a post office clerk. Liberty Mutual applies the correct postage to the mailings and lists the number of pieces going out on the certificate of mailing on the lower left-hand corner. The upper left-hand corner of the certificate of mailing contains the name and address of Liberty Mutual, the form number (CR108), the division, the date of issuance and the type of mailing, which in this case is a certificate of mailing. The notation "Division 4" at the top of Exhibit D-1 was identified by Brewer as the State of New Jersey.
The actual meter tapes which Liberty Mutual uses for metering the postage are affixed by Liberty Mutual to the certificate of mailing. The mailroom employees know the number of pieces which are being mailed from a count sheet which is generated with each list of names appearing on the "hereby" for New Jersey. *249 The fee for a mailing made pursuant to a certificate of mailing was forty-five cents in 1987.
Once the total number of pieces being mailed have been determined, the mail department brings the data mailers containing the cancellation notices to the post office for mailing and verification. In 1987 Liberty Mutual had to transport its bulk mail to the United States Post Office in Boston, Massachusetts, for verification because that was where Liberty Mutual's bulk mailing permit was located. Mailings were brought to Boston on a daily basis until the location of bulk mailing permit was changed from Boston to Portsmouth, New Hampshire.
Brewer testified that after the postal clerk verifies the information that Liberty Mutual has given the Post Office on the certificate of mailing, the postal clerk will initial the certificate, write down the number of pieces he has received and frank the certificate of mailing by placing a postal mark on top of the certificate of mailing which states the date and location of the post office where the mailing is received. Exhibit D-1 contains such a stamp marked "Boston, Massachusetts October 26, 1987 Back Bay Annex". A similar stamp appears on the top of the "hereby" (Exhibit D-2). The certificate of mailing and the "hereby" are then returned to Brewer's office for filing and safekeeping.
In his position as production supervisor Brewer certified at the trial that the file copy of the cancellation notice addressed to James Christian contained within Exhibit D-3 is a true copy of the notice mailed to James Christian on October 26, 1987. While the file copy of the cancellation notice contains at the top a certification that it is a duplicate copy of the original mailed to the policyholder, that certification is not signed or dated.
While Brewer was responsible for mailing the premium due notices, he testified that Liberty Mutual does not keep copies of those premium notices, and that Liberty Mutual did not have a copy of the premium notice mailed to plaintiff in October 1987. Brewer testified that it was Liberty Mutual's policy that cancellation *250 notices must be post marked within five days of the issue date of the cancellation notice, which in this case was October 27, 1987.
Randolph is a self-employed independent insurance broker who wrote various lines of personal insurance, including automobile insurance. Randolph had written auto insurance for plaintiffs on a 1973 American Gremlin (Exhibit P-2) and in October 1987 they requested him to insure the 1987 Oldsmobile Ciera. On October 7, 1987, he prepared a request for policy change to add that automobile to the policy issued by Liberty Mutual on behalf of the JUA (Exhibit P-4).
Randolph testified that it was standard procedure for Liberty Mutual, when it sends a premium notice to its policyholder, to simultaneously send him a duplicate copy of the premium notice. He identified as Exhibit D-7, the broker's copy of the cancellation notice which he received from Liberty Mutual. He testified that it was his practice to have his secretary mail by ordinary mail a reminder notice to the policyholder within a day or two of his receipt of the cancellation notice reminding the policyholder of the need to pay the premium in order to avoid cancellation of the policy and a lapse in coverage. The yellow carbon copy of that reminder notice was taken from Randolph's file and marked into evidence as Exhibit D-6. Since that reminder notice (Exhibit D-6) is dated November 5, 1987, it is reasonable to infer that Randolph received the broker's copy of the cancellation notice in his office on or about November 3, 1987. The reminder notice Randolph's office mailed to plaintiffs notified them of the type of insurance, the name of the company issuing the policy, a portion of the policy number, and the amount of the premium due and advised, in this case erroneously, that the policy was being cancelled for non-payment of premium effective November 10, 1987, rather then November 11, 1987, as stated in the cancellation notice issued by Liberty Mutual.
Randolph conceded that he did not speak with Mr. or Mrs. Christian before November 11, 1987, regarding the cancellation notice or cancellation of their automobile policy, but he testified *251 that the original of the reminder notice (Exhibit D-6) was mailed to Mr. Christian on November 5, 1987.
Randolph testified that on or about November 16, 1987, he spoke with Mr. Christian by telephone and during that telephone conversation Mr. Christian asked Randolph whether the policy issued by the JUA could be retroactively reinstated so that the policy would cover the accident of November 13th, but Randolph informed Mr. Christian that he could not do so. Accordingly, on November 18, 1987 James Christian came into Randolph's office and signed an application for issuance of a new policy covering the 1987 Oldsmobile (Exhibit D-8).
Mr. Christian did not testify at the trial and, accordingly, Randolph's testimony concerning his telephone conversation with Mr. Christian on November 16, 1987 was uncontroverted. Counsel for the JUA argues that the request by Mr. Christian for retroactive reinstatement of the policy evidences that the plaintiffs did in fact receive the cancellation notice, despite the denial of Mrs. Christian; that plaintiffs recognized that the policy was cancelled and were attempting to rectify their mistake; and that plaintiffs were not dealing in good faith with the carrier.
However, this argument fails to take into account the testimony of Mrs. Christian that when she reported the accident to Randolph's secretary on November 14, 1987, she was informed by Randolph's secretary that the policy had been cancelled the prior Wednesday, November 11, 1987. Mrs. Christian's testimony regarding that conversation also was uncontroverted since Mr. Randolph's secretary in November 1987, who is no longer employed by him, did not testify at the trial. Thus, the inquiry made by Mr. Christian on November 16, 1987, concerning retroactive reinstatement of the policy does not, by itself, warrant an inference that he had in fact received the cancellation notice, was attempting to rectify his error in failing to pay the premium in a timely fashion and was dealing in bad faith with the insurer. Rather, Mr. Christian's inquiry appears to be based upon his ignorance of the *252 law regarding cancellation of insurance policies, rather then being motivated by any effort to defraud the insurer.
On the other hand, the evidence concerning the mailing of the premium due notice, the fact that the address on the premium due notice is reflected through a see-through window envelope, Randolph's receipt of both the producer's copy of the premium notice and the producer's copy of the cancellation notice in the ordinary course of the mails, the procedures followed by Liberty Mutual with regard to the printing and mailing of the cancellation notices to plaintiff and Randolph, the mailing of a separate reminder notice by Randolph's office to Mr. Christian with regard to the cancellation of the policy and the demeanor of Mrs. Christian on the witness stand all lead the court to reject as not credible the testimony of Mrs. Christian denying receipt of all three notifications.
Based upon the foregoing evidence, the court also finds that Liberty Mutual mailed the cancellation notice to plaintiffs on October 26, 1987, but that the duplicate copy of the mailed notice retained by Liberty Mutual was not certified at the time of mailing to be a true copy of the original. The court further finds that plaintiffs received in the mails the premium notice, the Liberty Mutual cancellation notice and the reminder notice mailed by Mr. Randolph, and that plaintiffs, through oversight or otherwise, failed to pay the premium due on the 1987 Oldsmobile prior to its due date of November 10, 1987.
Counsel for plaintiffs, relying upon Celino v. General Acc. Ins., 211 N.J. Super. 538, 512 A.2d 496 (App.Div. 1986), and the provisions of N.J.S.A. 17:29C-10, argues that the failure of Liberty Mutual to have maintained a copy of the cancellation notice certified at the time of mailing to be a true copy of the original mailed to the plaintiffs is fatal to its cancellation defense, and accordingly, the judgment should be entered in plaintiffs' behalf declaring the cancellation notice to be ineffective to cancel the policy issued by Liberty Mutual on behalf of the JUA. Defendant, on the other hand, attempts to distinguish the Celino case on the *253 basis that case involved a motion for summary judgment and that a person having first hand knowledge and ultimate responsibility for the mailing provided testimony certifying that the copy of the cancellation notice retained by Liberty Mutual was a true copy of the original mailed to plaintiffs. Defendant further relies upon Weathers v. Hartford Insurance Group, 77 N.J. 228, 234, 390 A.2d 548 (1978), for the proposition that "cancellation may be effective whether or not the insured had actually received the notice of cancellation since proof of mailing, not proof of receipt, is the determinative factor." Defendant further argues that under Weathers "It is the function of the fact-finder to determine whether such mailing has occurred." Id. at 234, 390 A.2d 548.
Resolution of these conflicting positions requires an analysis of the legislative history of N.J.S.A. 17:29C-10 and the judicial interpretations given to that statute both before and after its amendment.
At the time that Weathers was decided, N.J.S.A. 17:29C-10 provided as follows: "Proof of mailing of notice of cancellation, or of intention not to renew or of reasons for cancellation to the named insured at the address shown in the policy, shall be sufficient proof of notice."
The Weathers Court construed the above statute as follows:
[U]nder N.J.S.A. 17:29C-10 cancellation may be effective whether or not the insured has actually received the notice of cancellation since proof of mailing, not proof of receipt, is the determinative factor. See [Weathers v. Hartford Insurance Group] 153 N.J. Super. [563] at 568 [380 A.2d 724 (1977)]. Consequently, evidence that the insured never received the notice of cancellation is not relevant to a material issue when introduced for the purpose of proving that fact.
We read the statutory language "[p]roof of mailing of notice of cancellation * * * shall be sufficient proof of notice," to mean that actual mailing of the cancellation notice suffices to establish notice. In other words, the statutory prerequisite to a valid cancellation is the mailing to the insured of a notice of cancellation providing the insured with the minimum notice specified in N.J.S.A. 17:29C-8. It is the function of the fact-finder to determine whether such mailing occurred. Of course, in accordance with normal procedure, the judge may take this issue from the fact-finder where the proofs are so conclusive as to establish mailing of [sic] non-mailing of the notice as a matter of law.
[77 N.J. at 234, 390 A.2d 548.]
*254 In Weathers, the trial court had failed to make a finding of fact as to whether the insurer had mailed the notice of cancellation to the plaintiff policyholder. The insurer had introduced a certificate of mailing to establish proof of mailing and argued that the certificate of mailing was sufficient to establish mailing of the notice to its policyholder as a matter of law. The Supreme Court rejected that argument, reasoning as follows:
Our determination that mailing was not established conclusively is based upon a number of factors affecting the weight of defendant's proofs. The postal clerk who stamps the certification of mailing does not examine the contents of the envelope purportedly containing the notice. The single supervisory official who testified for defendant in this case did not indicate personal knowledge as to individualized review of the envelopes by a postal clerk before the postmark is affixed. Evidence from personnel in defendant's organization charged with mailing notices and from postal employees as to their verification of the contents of mailed envelopes would have established a stronger case than what defendant adduced. Defendant's witness conceded it was possible that a given envelope might not contain a notice to the person purportedly addressed. Thus, while defendant's proof of mailing was sufficient to go to the fact-finder on the issue, it did not compel a finding of mailing as a matter of law.

[Id. at 235, 390 A.2d 548, (emphasis added).]
The court in Weathers went on to hold that the testimony of the policyholder that she never received the notice of cancellation was admissible for the purposes of refuting the contention that the notice was mailed and did not add to the insurer's statutory burden by requiring proof of actual receipt. Id. at 235-236, 390 A.2d 548.
Following the Weathers decision, N.J.S.A. 17:29C-10 was amended in 1980, effective March 9, 1981, to read as follows:
No written notice of cancellation or of intention not to renew sent by an insurer to an insured in accordance with the provisions of an automobile insurance policy shall be effective unless a. (1) it is sent by certified mail or (2) at the time of the mailing of said notice, by regular mail, the insurer has obtained from the Post Office Department a date stamped proof of mailing showing the name and address of the insured and b. the insurer has retained a duplicate copy of the mailed notice which is certified to be a true copy.
The purpose of the 1980 amendment to N.J.S.A. 17:29C-10 was construed in Celino as follows:
We regard the 1980 amendment of N.J.S.A. 17:29C-10 as a direct legislative response to the practical problems engendered by Weathers. The statement of the *255 Senate Labor, Industry and Professions Committee endorsing the bill enacted as L. 1980, c. 165 explains in part:
To be effective cancellation notices must be sent by certified mail, return receipt requested, and proof of mailing must be accompanied by a return receipt signed by the policyholder or a member of his household or, the insurer must obtain from the Post Office Department a date stamped proof of mailing showing the name and address of the insured, and must retain a copy of the mailed notice which is certified to be a true copy.
A recent court decision[,] Weathers v. Hartford, argued in the Supreme Court on April 24, 1983, cast some doubt on the sufficiency of the proof of mailing requirement of P.L. 1968, c. 518 (C 17:29C-10). This bill is signed to make the proof of mailing requirement more explicit.
As we therefore construe the statutory condition of a retained certified duplicate copy, it is designed to ease the carrier's proof of mailing burden imposed by Weathers by providing it with a simple, expedient and effective alternative to reliance on standard practice in sending notices. This alternate is its retention of a duplicate copy of the notice, certified to be true copy. But as we understand the intent of the statute, this mechanism requires that the duplicate be certified as a true copy contemporaneously with preparation and mailing of the original. The whole point of the requirement is to permit a clerical employee or other custodian of the business record to testify that the file copy is known to be a true copy of the mailed document because the person mailing it so certified at that time. The added weight of the evidence thus afforded to the file copy is therefore clearly dependent on the contemporaneous certification. A certification made later would be hardly more than an in-house version of standard-practice proof.
[211 N.J. Super. at 542-43, 512 A.2d 496.]
The interpretation given to N.J.S.A. 17:29C-10 by the Celino court in requiring that the duplicate copies of the cancellation notices be certified contemporaneously with the preparation and mailing of the originals, appears to impose a burden upon the insurer which in many cases is greater than that imposed upon insurer by the Weathers case. In this case, for example, 573 notices of cancellation were mailed by Liberty Mutual to the State of New Jersey on October 26, 1987. Because the notices of cancellation were printed by computer, and the policyholder's copy enclosed within a self-contained sealed envelope which is never opened by Liberty Mutual's mail department, a certification made contemporaneously with the mailing, as required by Celino, would be impossible for Liberty Mutual to furnish and still employ the modern techniques utilized by it in mailing cancellation notices. It would be impossible for anyone employed by Liberty Mutual to *256 examine the contents of the sealed envelope in order to determine whether the file copy of the cancellation notice was identical with the one contained within the envelope mailed to the insured. Moreover, comparing file copies of well over 500 cancellation notices per day with those being mailed that day would place an extreme clerical and financial burden upon insurers to effect cancellation of policies issued by them.
On the other hand, the procedures described by Brewer at the trial regarding the computer generation and printing of the company file copy and the policyholder's and broker's copies of the cancellation notice provide a strong inference that the company's file copy of the notice is identical to the one mailed to the policyholder. Moreover, it should be noted that neither the statute nor its legislative history expressly requires the insurer to contemporaneously certify that the copy retained by it is a true copy of the notice mailed to the insured. The Celino court inferred such an intent from its reading of the statute and legislative history.
It seems to this court that the legislative purpose in enacting N.J.S.A. 17:29C-10 would also be equally served by permitting an employee of the insurer with personal knowledge to certify during the pendency of the action or at time of trial that the copy of the cancellation notice retained by the insurer is a true copy of the one mailed to the policyholder and allowing the issue to be resolved by the fact finder unless the proofs are so convincing as to allow the trial court to resolve the issue as a matter of law. However, until the question is revisited by the Appellate Division, this court is bound by the interpretation given to N.J.S.A. 17:29C-10 by Celino.
The Celino case involved an automobile policy issued in the voluntary insurance market. In concluding that the notification provisions of N.J.S.A. 17:29C-10 do not apply to a JUA policy, the court in Lopez v. Ins. Underwriting Ass'n, 239 N.J. Super. 13, 570 A.2d 994 (App.Div.) (emphasis added), certif denied, 122 N.J. 131, 584 A.2d 206 (1990), reasoned as follows:

*257 In order to be effective, notices of non-renewal, like notices of cancellation, pertaining to voluntary market policies must be sent in strict compliance with the provisions of N.J.S.A. 17:29C-10. That statute requires the insurer to provide proof of notice by using certified mail or by obtaining a date stamped proof of mailing from the post office. It also requires the insurer to retain a duplicate copy of the mailed notice certified to be a true copy. There is no corollary provision in the JUA rules pertaining to notices of non-renewal or, for that matter, notices of cancellation. Indeed, N.J.S.A. 17:29C-6(A) specifically states that the "Act concerning cancellation and non-renewal of automobile liability, physical damage or collision insurance policies", of which N.J.S.A. 17:29C-10 is a part, is not applicable to "any policy issued under an automobile assigned risk plan, ...." Therefore, it would appear that because the JUA is a successor to the Assigned Risk Plan, Lilly, 218 N.J. Super. at 315, 320, 527 A.2d 903, the notification provisions of N.J.S.A. 17:29C-10 do not apply to a JUA policy.

[Id. at 20, 570 A.2d 994.]
However, the Lopez court interpreted the Performance Standards of the JUA rules, which require all servicing carriers to process all JUA policies in a manner substantially the same as they would service voluntary market policyholders, as follows:
We construe the preamble to require reference to the statutes and regulations applicable to the voluntary automobile insurance market where JUA rules are silent or where their meaning is ambiguous. Such construction permits voluntary market insurers and JUA servicing carriers to follow uniform procedures so as to avoid confusion and obtain predictable results in like circumstances.
For example, the JUA Rules require that the servicing carrier "mail or deliver" cancellation notices and state that non-renewal notices shall be "provided" to the insured. Because there is ambiguity in the rules concerning how the notices are to be mailed or provided to the insured, the preamble to the JUA rules directs the inquiry to the applicable voluntary market statute, i.e., N.J.S.A. 17:29C-10, and Lilly so holds.
[Id. at 20-21, 570 A.2d 994.]
It should be noted, however, that Lopez did not deal expressly with a cancellation issue, but rather with the issue of whether the JUA servicing carrier was required to follow the procedures prescribed by the Cancellation and Non-Renewal Act, N.J.S.A. 17:29C-6 to -13, when the policyholder fails, on policy renewal, to pay the premium on the renewal policy when due. The court in Lopez held there was no such duty imposed upon the JUA servicing carrier.
In addition to the Lopez court's dicta demonstrating the intent of the Commissioner of Insurance that the JUA servicing carriers *258 comply with the provisions of the Cancellation and Non-Renewal Act, including N.J.S.A. 17:29C-10, the intent of the Legislature also to require such compliance may be inferred from N.J.S.A. 17:30E-6(a) which directs the Commissioner of Insurance to adopt a plan of operation for the JUA which shall provide for, among other things, "minimum requirements for the ... performance of servicing carriers," but which provides that "nothing herein shall be interpreted to affect the provisions of P.L. 1968, c. 158 (C.17:29C-6 et seq.)."
The effect of the ruling in Celino has been substantially mitigated, however, by Lilly v. Allstate Ins. Co., 218 N.J. Super. 313, 527 A.2d 903 (App.Div. 1987). In Lilly the court rejected plaintiff's argument that, although he received the cancellation notice, it was ineffective to cancel the policy since the insurer had not demonstrated compliance with subsection b of N.J.S.A. 17:29C-10 by contemporaneously retaining "a duplicate copy of the mailed notice which is certified to be a true copy". In rejecting this argument, the court in Lilly reasoned as follows:
In Celino, supra, the court held that failure to comply with both subsections of the statute was fatal to the insurer. 211 N.J. Super. at 541, 543 [512 A.2d 496]. In that case however there was evidence that neither the insured nor the finance company ever received the notice of cancellation. To prove mailing, the insurer only produced photocopies of the post office certificate of mail forms. Id. at 540 [512 A.2d 496]. We viewed N.J.S.A. 17:29C-10 as the Legislature's response to some practical proof of mailing problems.
In both Weathers and Celino the insured's lack of receipt brought into question whether there was proper mailing. Here it is known that Allstate mailed the notice since plaintiff received it. While the insured's alleged late receipt of the notice raises questions about when it was mailed, Allstate has fulfilled the first prong of the statute by presenting a proof of mailing stamp showing a mailing date of March 6, 1984. Since plaintiff concedes receipt of the notice we fail to see how he was prejudiced by any failure on Allstate's part to retain a duplicate certified copy.
[Id. at 324-25, 527 A.2d 903.]
This court does not interpret the analysis and holding in the Lilly case to be limited to situations in which the policyholder concedes receipt of the cancellation notice. A literal reading of N.J.S.A. 17:29C-10 would have rendered the cancellation notice in Lilly ineffective because the insurer failed to retain a duplicate or *259 certified copy. Yet the Court in Lilly held otherwise based upon the policyholder's admitted receipt of the cancellation notice. To limit Lilly to instances in which the policyholder makes such an admission of receipt of the cancellation notice would be to encourage perjury by the policyholder in all cancellation cases. Rather, this court interprets Lilly as permitting the fact finder, in cases where the insurer has failed to retain a duplicate contemporaneously certified copy of the cancellation notice, to determine whether the insurance company mailed and the policyholder has in fact received the cancellation notice. In this case, the court has concluded that Liberty Mutual did in fact mail the cancellation notice to plaintiff, that Mrs. Christian's testimony regarding non-receipt of that notice was not credible, and that plaintiffs in fact received the cancellation notice mailed by Liberty Mutual.
The recent decision of the Appellate Division in Hodges v. Pa. Nat'l Ins. Co., 260 N.J. Super. 217, 615 A.2d 1259 (App.Div. 1992), by inference supports the conclusion reached above. In Hodges defendant, as servicing carrier for the JUA, had obtained summary judgment dismissing plaintiff's complaint for PIP benefits because her mother's automobile policy had been purportedly cancelled prior to the date of the accident. Plaintiff had certified that she had no knowledge of the cancellation until her claim for PIP benefits was rejected by the defendant. Defendant had retained a certified copy of the cancellation notice, and the issue on appeal was whether defendant's proof of mailing of the cancellation notice was in compliance with N.J.S.A. 17:29C-10, or whether there was an issue of fact with regard to the mailing of that notice which required resolution by the trier of fact. The form used by the insurer to prove mailing of the notice was a "mailing receipt" appearing at the end of so-called "JUA Mailing List" of 640 names and addresses of JUA policyholders to whom cancellation or non-renewal notices had been purportedly sent by defendant via regular mail on November 28, 1988. The correct name and address of plaintiff's mother, the named insured on the policy, was included on one of the pages of the JUA mailing list. The final page of the JUA mailing list contained two November 28, *260 1988, stamps of the Harrisburg  Linglestown, Pennsylvania, Post Office and two postage stamps totaling $138.75. Plaintiff contended that 640 notices at $.25 per piece, the 1988 regular mail postage stamp price, should have totalled $160.00 and that since defendant had paid only $138.75, there was an inference that not all the listed notices had been mailed, thereby raising a question of fact to the mailing of the notice to plaintiff's mother.
There was evidence submitted by affidavit of a Harrisburg postal official to the effect that when 20 or more letters are sent by certified mail, it is customary for the mailing party to prepare a list stamped with a legitimate authorized mailing receipt, and that the stamp affixed by the post office to the defendant's JUA mailing list was such as mailing receipt authorized by the Harrisburg, Pa. Post Office. However, the cancellation notices in Hodges were mailed by defendant by ordinary mail, and the affidavit of the Harrisburg postal official made no comment as to the procedures used by the Post Office for letters sent by regular mail.
Plaintiffs' counsel submitted by way of certification of copy of an official "Certificate of Mailing" form, P.S. Form # 3817, issued in March 1989, which they asserted is issued by the U.S. Post Office for documentary proof of mailing by regular mail. This form requires Postal Service employees to compare the receipt with the name and address on the item being mailed. However, there was no evidence that the form produced by plaintiffs' counsel, which he obtained from the Laurenceville, New Jersey, post office, was in use on November 28, 1988, when the cancellation notice in question was mailed.
The trial court in Hodges ruled that the "mailing list" receipted by the Harrisburg, Pa. Post Office constituted a "date stamped proof of mailing" as required by N.J.S.A. 17:29C-10. The Appellate Division rejected this conclusion and held, because of the incorrect amount of postage appearing on the "mailing list", that the Harrisburg, Pa. post office stamp and postage appearing on the mailing list was merely proof of payment of $138.75 in postage.
*261 After referring to the legislative statement accompanying the 1980 amendment to N.J.S.A. 17:29C-10 referred in the Celino case and quoted above at p. 254-55, 631 A.2d at p. 167, as well as the Governor's statement upon his signing of the bill, the Appellate Division, in reversing and remanding for trial, reasoned as follows:
Thus the statute could be read to require the official Certificate of Mailing as the only acceptable "date stamped proof of mailing." We do not, however make such a determination. But even if we accept equivalent proof, defendant's proof of payment of postage and employee's certification fall far short of the quality of proof inherent in an official post office certificate. A Certificate of Mailing entails individual review of letters and addresses by a postal employee; defendant's system entails only a self-serving cursory verification of a list of 640 names and address. Particularly disturbing about defendant's proof is the fact that defendant only paid $138.75, enough money for posting only 555 letters at $.25 per letter, yet the list claims 640 total mailings. Defendant does not account for this discrepancy of eighty-five notices printed on the master list but not accounted for in postage.
We do not hold that only the official post office certificate will satisfy N.J.S.A. 17:29C-10. The particular form is not a talisman, the absence of which precludes a finding that the notice was mailed. But the statute must be satisfied. "No written notice of cancellation ... shall be effective unless ... the insurer has obtained from the Post Office Department a date stamped proof of mailing" (N.J.S.A. 17:29C-20), is strong language. It does, however, permit the insurer to prove by extrinsic evidence that the date stamped proof of payment of $138.75 was in fact the post office's proof that the letter to plaintiff's mother was mailed on November 28, 1988. This necessarily requires additional proof that a post office employee checked each name and address on the list against the envelopes being mailed. The deficient postage makes this requirement vital.
[260 N.J. Super. at 226-27, 615 A.2d 1259.]
The Hodges court concludes that "[b]ecause defendant's present proofs are insufficient to establish compliance with statute, there exist unresolved issues of fact." Id. at 227, 615 A.2d 1259. While Hodges deals with the adequacy of the "proof of mailing," its reasoning, together with that in Lilly, leads this court to conclude that where the trier of fact has found from the proofs that the insurer did in fact mail the cancellation notice to its policyholder at the address listed in the policy and that the policyholder received the cancellation notice, as this court has here concluded, and where the insurer has retained an uncertified copy of the cancellation notice prepared contemporaneously with the one mailed to its policyholder and subsequently certified by an employee of the insurer with personal knowledge as being a true *262 copy of the one mailed to the policyholder, the insured cannot be prejudiced by the failure of the insurer to contemporaneously certify that its copy of the cancellation notice is a true copy of the one mailed to its policyholder.
It should be noted that in this case, unlike Hodges, the amount of postage on the "Certificate of Mailing" (Exhibit D-1) was $257.85. At the rate of $.45 per piece which, according to Brewer, applied to this kind of mailing, the sum of $257.85 was the correct amount for the 573 items which were mailed by Liberty Mutual to New Jersey on October 26, 1987. While the form labeled as "Certificate of Mailing" is not the same as the one reproduced in the Hodges opinion, it is a formal Postal Service form (PS Form 3877) dated February 1982 which, according to Brewer, was the Certificate of Mailing form in use in 1987 for bulk mailings of this type. Brewer's testimony in that regard was uncontroverted.
Moreover, even if the "Certificate of Mailing" form is nothing more than proof of a Postal Service receipt of payment, the court's finding that the cancellation notice in question was mailed to plaintiffs is more then amply supported by the evidence. This finding is supported by Brewer's testimony concerning Liberty Mutual's procedures for printing and mailing cancellation notices; the existence of the Liberty Mutual's file copy of the cancellation notices mailed to James Christian and Randolph, (Exhibit D-3); the fact that the addresses noted thereon were the correct addresses in October 1987 for plaintiffs and Randolph; the fact that the names and addresses of both plaintiffs and Randolph appear on the "hereby" which contains 573 names and addresses (Exhibit D-2); the Certificate of Mailing (Exhibit D-1) which contains the proper amount of postage for 573 items mailed on October 26, 1987 from the Boston, MA post office; and the evidence that Randolph received the broker's copy of the cancellation notice in the mail which, pursuant to the Liberty Mutual procedures, was mailed contemporaneously with the mailing of the cancellation notice to plaintiff, James Christian, as the named insured.
*263 Two factors discussed below lead this court to conclude, nevertheless, that the cancellation notice mailed by Liberty Mutual was ineffective to cancel the policy prior to the date of the November 13, 1987, accident. These factors are: (1) the cancellation notice was issued prior to the date on which the premium was due and thus cancellation for "non-payment of premium" by Liberty Mutual was in violation of the obvious intent of the cancellation statutes N.J.S.A. 17:29C-6(F), 17:29C-7(A)(a) and 17:29C-8; and (2) Liberty Mutual has failed to demonstrate compliance with the requirements with N.J.A.C. 11:3-7.6(b) or (e).
Our appellate courts have interpreted the insurance cancellation laws of New Jersey to require that "A notice of cancellation of a policy of automobile liability insurance is effective in this State only if it is based on one or more statutorily enumerated reasons, including the non-payment of premiums. N.J.S.A. 17:29C-7(A)(a)." State v. Hochman, 188 N.J. Super. 382, 388, 457 A.2d 1156 (App.Div. 1982).
N.J.S.A. 17:29C-8 (emphasis added), which contains the legislative mandate concerning the amount of advance notice which must be furnished by the insurer in order for a cancellation to be effective, provides as follows:
No notice of cancellation of a policy to which section 2(1) applies shall be effective unless mailed or delivered by the insurer to the named insured at least 20 days prior to the effective date of cancellation; provided however, that where cancellation is for nonpayment of premium at least 15 days' notice of cancellation accompanied by the reason therefor shall be given. Unless the reason accompanies or is included in the notice of cancellation, the notice of cancellation shall state or be accompanied by a statement that upon written request of the named insured, mailed or delivered to the insurer not less than 15 days prior to the effective date of cancellation, the insurer will specify the reason for such cancellation.
The term "non-payment of premium" as used in the insurance cancellation statute is defined by N.J.S.A. 17:29C-6(F) as follows:
"Nonpayment of premium" means failure of the named insured to discharge when due any of his obligations in connection with the payment of premiums on a policy, or any installment of such premium, whether the premium is payable directly to the insurer or its agent or indirectly under any premium finance plan or extension of credit.
*264 As noted above, Liberty Mutual issued a premium notice to plaintiff on October 21, 1987, requiring payment of a premium of $362 for the 1987 Oldsmobile by November 10, 1987. No evidence was presented as to the date on which the October 21, 1987, premium notice was mailed, but it may be inferred that it was mailed at least a day or more prior to the date on which the cancellation notice was mailed since it is dated one day prior to the date of the cancellation notice. The cancellation notice was mailed on October 26, 1987, and notified plaintiffs that cancellation was effective on November 11, 1987, the day after the premium payment was due. The cancellation notice states the reason for cancellation as being "for non-payment of premium." On the date that the cancellation notice was mailed, the premium due by plaintiffs to the JUA was not past due.
This question of whether an insurer can issue a cancellation notice cancelling a policy for non-payment of premium prior to the date on which the premium or any installment thereof is due, even though the effective date of cancellation is one day after the premium due date, appears to be one of first impression in New Jersey. The court's research has disclosed one out of state case interpreting New Jersey law dealing with a premature notice of cancellation, but that case is factually distinguishable.
In Application of Ins. Co. of North America, 102 Misc.2d 1119, 425 N.Y.S.2d 479 (Sup.Ct. 1980), State Farm Insurance Company had mailed a notice of cancellation to its policyholder, Francis Sabo, a New Jersey resident, on August 2, 1978, effective August 17, 1978. The reason for cancellation stated in the notice was "due to bounced check." The evidence adduced at the trial showed that Sabo had been insured under a one year assigned risk policy issued by State Farm effective April 24, 1978. Three days later he issued a check of $25 to his broker which was returned to State Farm in July 1978 for "insufficient funds." However, between April 24, 1978, and July 1978 State Farm had received two premium installment payments from Sabo totaling in excess of $500 and that no further premium payments were due from Sabo *265 until August 29, 1978. The court held that under such circumstances "The purported notice of cancellation of the insurance dated August 2, 1978 effective as of August 17, 1978 for non-payment of premium, was, therefore, premature, and was not authorized and was invalid." Id., 425 N.Y.S.2d at 482.
Application of Ins. Co. of North America, supra, is obviously distinguishable since the premature notice of cancellation issued in that case purported to cancel the policy effective on a date twelve days prior to the date on which the premium was due and gave a reason for cancellation not authorized by statute. N.J.S.A. 17:29C-7(A). In this case, Liberty Mutual's notice of cancellation was for a reason authorized by the statute, non-payment of premium, and purports to cancel the policy the day after the premium was due. However, the issue presented is whether an insurer may issue such a notice of cancellation for "non-payment of premium" when, at the time that the cancellation notice is issued, the policyholder is not in default on the payment of any premium, or any installment of any premium, on the policy.
The JUA argues that since there is no statutory provision or case law mandating that a cancellation notice for non-payment of premium be mailed after the premium due date, the cancellation notice may be mailed at any time after the mailing of the premium notice so long as cancellation does not become effective until after the premium due date. Clearly the cancellation statute does not contain an express provision prohibiting the insurer from mailing a notice of cancellation for non-payment of premium prior to the premium due date or expressly requiring the insurer to mail such a notice after the premium due date. Accordingly, it will be necessary to construe the statutory language to determine the Legislature's intent.
In determining the legislative intent under such circumstances, several principles of statutory construction are applicable. In Lomarch Corp. v. Mayor of Englewood, 51 N.J. 108, 113, 237 A.2d 881 (1968), the Supreme Court observed that "A statute often speaks as plainly by inference as by express words" and that "The *266 details for the accomplishment of a statutory objective do not have to be specifically spelled out with particularity." Accord, Juzek v. Hackensack Water Co., 48 N.J. 302, 314-15, 225 A.2d 335 (1966); In re Loch Arbour, 25 N.J. 258, 262-63, 135 A.2d 663 (1957). Where, as in the instant case, the drafters of a statute did not consider or contemplate a specific situation, the statute is to be construed in conformity with the probable intent of the draftsman as if he had anticipated the situation presented to the court. Amerada Hess Corp. v. Div. of Tax, 107 N.J. 307, 318, 526 A.2d 1029 (1987), aff'd 490 U.S. 66, 109 S.Ct. 1617, 104 L.Ed.2d 58 (1989); J.C. Chap. Prop. Owner's, etc. Assoc. v. City Council, 55 N.J. 86, 100-01, 259 A.2d 698 (1969); Dvorkin v. Dover Tp., 29 N.J. 303, 315, 148 A.2d 793 (1959). An ancient maxim of statutory construction which also appears applicable in this case is that the "the meaning of words may be indicated and controlled by those with which they are associated." Germann v. Matriss, 55 N.J. 193, 220, 260 A.2d 825 (1970). Accord, Martell v. Lane, 22 N.J. 110, 117, 123 A.2d 541 (1956); Dept. of Health v. Sol Schnoll Dressed Poultry Co., 102 N.J. Super. 172, 175, 245 A.2d 532 (App.Div. 1968).
N.J.S.A. 17:29C-7(A)(a) permits cancellation for "non-payment of premium." N.J.S.A. 17:29C-8 requires that where cancellation is for non-payment of premium, the insurer must give the policyholder "at least 15 days notice of cancellation accompanied by the reason therefor." When these sections of the statutes are read together with the statutory definition of "non-payment of premium," it is apparent that the Legislature intended to provide policyholders with a fifteen-day grace period after default in the payment of a premium under an automobile insurance policy before the insurer can effectively cancel the policy. This additional notice was intended to provide policyholders who default in payment of their premium an opportunity during the fifteen-day grace period to pay the past due premiums and keep the policy in force. Accordingly, the notice of cancellation for "non-payment of premium" issued at a point in time when plaintiffs had not failed *267 to discharge when due their premium payment obligations is invalid and unenforceable because it was premature and because it violated the legislative intent as construed above.
In effecting a cancellation of a policy, servicing carriers for the JUA, such as Liberty Mutual in this case, are required to make "reference to the statutes and regulations applicable to voluntary automobile insurance market where JUA rules are silent or where their meaning is ambiguous." Lopez v. Ins. Underwriting Ass'n, supra, 239 N.J. Super. at 21, 570 A.2d 994.
N.J.A.C. 11:3-7.6(b) and (e) provide as follows:
(b) The effective date of the cancellation of a policy for nonpayment of premium shall not be earlier than 10 days prior to the last full day of which premium received by the company prior to the date of preparation of the cancellation notice, would pay for coverage on a pro rata basis. In calculating the effective date of cancellation as provided in this section, the premium applicable to the coverage provided by the policy and the premium received by the company at or prior to the time cancellation notice was prepared shall be the premium used for calculation and determination of such effective date.
....
(e) The rule shall not apply to deposits accompanying New Jersey Automobile Insurance Plan applications which are insufficient under Plan rules or those of any succeeding residual market availability plan.
The servicing carrier rules of practice promulgated by the JUA with respect to cancellation of insurance policies do not contain rules contrary to those provided in N.J.A.C. 11:3-7.6(b) or (e), and accordingly, the latter regulations govern determination of the permissible effective date of cancellation. Ibid.
The policy issued by Liberty Mutual to plaintiffs effective February 28, 1987, contained provisions for payment of premiums on the 1973 Gremlin in the sum of $432. No proofs were provided at the time of trial demonstrating whether that premium was paid in full prior to the date of cancellation, nor was there any information provided to suggest either that the effective date of cancellation was more or less than ten days prior to the last full day on which premium received by Liberty Mutual prior to the date of preparation of the cancellation notice would pay for coverage on a prorated basis as required by paragraph (b) of the *268 above referenced Insurance Department regulation, nor was any evidence furnished by Liberty Mutual that indicated that the provisions of paragraph (e) of that regulation applied so as to establish that plaintiffs were not entitled to have their premium prorated under paragraph (b) of the regulation. See Lilly v. Allstate Ins. Co., supra, 218 N.J. Super. at 318, 527 A.2d 903.
Since policy cancellation is an affirmative defense asserted by the JUA to plaintiff's claim for coverage, R. 4:5-4, the burden proof is upon the JUA to demonstrate compliance with the above cited Insurance Department regulations. See Italian Fisherman v. Commercial Union Assur., 215 N.J. Super. 278, 282, 521 A.2d 912 (App.Div.), certif. denied, 107 N.J. 152, 526 A.2d 211 (1987). Having failed to satisfy that burden of proof, the JUA's defense of cancellation of the policy prior to the date of the November 13, 1987, accident must also fail.
For the reasons stated above, judgment will be entered in favor of plaintiffs and against the defendant JUA declaring plaintiffs are entitled to recovery under the PIP and collision sections and to coverage under the liability provisions of policy number AB9 339 124908 007 5 issued to plaintiff James Christian by Liberty Mutual as servicing carrier for the JUA. The JUA will also assume the defense of plaintiffs in the action bought against them by Eben Blackson and indemnify plaintiffs, subject to policy limits, for the amount of any judgment recovered against them by Eben Blackson.
In addition, plaintiffs are entitled to recover attorney's fees for the defense of the Blackson action and pursuant to R. 4:42-9(a)(6) for the prosecution of this coverage action. Guarantee Ins. Co. v. Saltman, 217 N.J. Super. 604, 612-13, 526 A.2d 731 (App.Div. 1987); Tooker v. Hartford Accident & Indem. Co., 136 N.J. Super. 572, 576, 347 A.2d 371 (App.Div. 1975). Plaintiffs are also entitled, pursuant to N.J.S.A. 39:6A-5c, to an award of interest on the amount of any past due PIP benefits. Skryha v. Pa. Nat. Mut. Cos., 206 N.J. Super. 66, 77, 501 A.2d 1021 (App.Div. *269 1985); Brokenbaugh v. N.J. Mfr's Ins. Co., 158 N.J. Super. 424, 435, 386 A.2d 433 (App.Div. 1978).
Counsel for plaintiff is to submit an affidavit of services and an order for entry of judgment against the JUA in conformity with this opinion.
NOTES
[1] The amended complaint does not seek a declaration that the defendant JUA is required to furnish a defense and coverage to plaintiffs under the liability section of the policy issued by the JUA with respect to the personal injury claims asserted against them by Blackson arising out of the November 13 accident. It appears that the failure to include a claim for such relief in the declaratory judgment suit was one of oversight by plaintiffs' counsel. The statute of limitations has not yet run on that claim and both Liberty Mutual and the JUA have been aware of the Blackson action since service of the amended complaint on Liberty Mutual. Moreover, any ruling with regard to the efficacy of the cancellation defense would apply equally to the issue of coverage with respect to the Blackson liability claim as with respect to the claims for PIP and collision damage coverage. Under the circumstances, the amended complaint should be deemed amended, pursuant to R. 4:9-2 to permit plaintiffs to assert a claim against the JUA for coverage of the Blackson liability claim. In any event the court had a conference telephone call with counsel for plaintiffs and defendant JUA on October 23, 1992, concerning the omission of any claim for coverage under the liability provisions of the policy with respect to the Blackson litigation. Counsel for the JUA consented to an amendment of the complaint to assert such a claim, stating that he had assumed throughout the course of this litigation that such claim had been pleaded Accordingly, the complaint will be deemed so amended.